BROWNING, Circuit Judge:
Defendant Noel Shields appeals the denial of his motion for summary judgment based on his assertion of qualified immunity against Plaintiff Kimberly Kennedy’s 42 U.S.C. § 1988 claim. He argues that his conduct did not violate Plaintiffs clearly established constitutional rights. We disagree, and affirm the district court’s determination that, on the facts alleged, Shields is not entitled to qualified immunity.
I. Introduction
The following initial facts are undisputed. Kimberly Kennedy’s § 1983 action against Ridgefield City and Ridgefield Police Officer Noel Shields stems from events occurring on September 24, 1998, when a thirteen year-old neighbor, Michael Burns, shot and killed her husband, Jay Kennedy, and shot and severely wounded her. Earlier that same month, on September 6, Kennedy called the Ridgefield Police Department (“RPD”) and alleged that Burns had molested Kennedy’s nine-year-old daughter. RPD Officer Shields responded to the call. Burns shot the Kennedys within approximately eight hours of first learning of the allegations against him. He has since been convicted of the premeditated murder of Jay Kennedy and the attempted premeditated murder of Kimberly.
At this early stage in the litigation, there are indeed facts which the parties dispute. However, because Shields contends that, even after resolving all issues of fact in Kennedy’s favor, she fails to demonstrate that he violated her constitutional rights, we present and consider the remaining facts, where appropriate, in a light most favorable to Kennedy.
During their initial meeting on September 6, Kennedy warned Shields of Michael Burns’s known, violent tendencies. She told Shields that the Burns family was unstable, that she had seen a lot of violence in their home, and described to Shields several violent incidents involving both Michael and his mother, Angela Burns. Kennedy told Shields that Michael had been involved in fights at school, had lit a cat on fire, had broken into his girlfriend’s house and attacked her with a baseball bat, and had thrown rocks at a *1058 building in downtown Ridgefield. After learning of- Burns’s violent behavior, Shields assured Kennedy that she would be given notice prior to any police contact with the Burns family about her allegations. -
Following that meeting, Shields forwarded his report to the Child Abuse and Intervention Center (“CAIC”). Shields had no further contact with Kennedy between September 6 and September 24, the night of the shooting.' On several occasions, Kennedy inquired into the status of the investigation of Michael and reminded officers to notify her prior to any contact with the Burns family. In the interim, she and Shields both' learned that Michael had been investigated for sending death threats to a classmate,' though the investigation concluded he was not responsible. During her inquiries, Kennedy expressed concern fbr her safety and told the CAIC officer handling the case that she was anxious to have the investigation started.
On September 24, Kennedy called both Shields and the CAIC to inquire into the progress of the investigation. Kennedy left a message for Shields asking about the status of the alleged molestation case, and whether he had yet contacted Burns. After receiving Kennedy’s message when he arrived at work that afternoon, Shields called the CAIC to inquire into the status of the investigation. The officer responsible for the case was out, so Shields left his own message. Then, rather than calling Kennedy with an update, Officer Shields drove to the Burns residence. Shields claims he did so because the Burns house was on the way to the Kennedy’s, and if he could determine whether they had been contacted, he could continue to the Kennedy’s with more accurate information. At approximately 5:00 p.m., Shields talked to Angela Burns, informing her and Michael of Kennedy’s allegations.
After speaking with Angela, Shields went to the Kennedy house. When he arrived, at approximately 5:15 p.m., Shields told Kennedy that he had informed Angela Burns of the molestation allegations. Kennedy became upset and asked Shields why he had contacted the Burns family prior to notifying her and told Shields that she feared for her safety. Officer Shields assured her that the police would patrol the area around both her house and the Burns’s house that night to keep an eye on Michael.
After Shields left, Kennedy called a friend because she was very frightened of what Michael’s and his mother’s reactions would be. Shields had told her Angela was very angry after their conversation and that she and Michael had begun to yell at one another. Kennedy took no further action until about 10:00 p.m. that night when her husband returned from a hunter’s safety course. He had left their house to attend the course just as Shields had arrived that afternoon. The Kennedys decided to stay the rest of the night at home, in part because of the late hour, and in part because Shields allegedly promised to patrol the neighborhood. They planned to lock their doors and leave town early the next morning. But early on the morning of September 25, Michael Burns broke into the Kennedy house and shot both Jay and Kimberly Kennedy while they slept.
Kennedy filed suit against Shields and Ridgefield City, among others, in Clark County Superior Court asserting several state causes of action and a claim under 42 U.S.C. § 1983 and the Fourteenth Amendment. The case was removed to the United States District Court for the Western District of Washington. On March 13, 2003, Shields and Ridgefield City moved for summary judgment. The court granted summary judgment to Defendants on Kennedy’s state law claims of negligent *1059 infliction of emotional distress and the tort of outrage, and to Ridgefield City on her § 1983 “failure to train” claim.
However, the district court denied Shields’s motion for summary judgment based on qualified immunity. It concluded that, viewing the facts in a light most favorable to Kennedy, “a jury could find that Officer Shields unreasonably created a false sense of security in plaintiffs by agreeing to give plaintiffs advanced notice of advising the Burns family of the allegation that Michael Burns sexually molested [Kennedy’s daughter], and assuring the plaintiffs of a neighborhood patrol.” Order, at 4-5. This interlocutory appeal followed.
II. Analysis
This case presents two legal issues. First, we must consider whether this Court has jurisdiction over Shields’s interlocutory appeal concerning his qualified immunity defense. If so, we must then determine whether Shields is entitled to such immunity.
We review de novo an interlocutory appeal from the denial of summary judgment based on qualified immunity. Wilkins v. City of Oakland, 350 F.3d 949, 954 (9th Cir.2003). In reviewing a summary judgment order in a § 1983 action where the district court determines that “the defendant’s alleged conduct violated the plaintiffs clearly established constitutional rights[,] ... we resolve all factual disputes in favor of the plaintiff....” Cunningham v. City of Wenatchee, 345 F.3d 802, 807 (9th Cir.2003).
A. Jurisdiction over Qualified Immunity Claims on Interlocutory Appeal
In response to Shields’s interlocutory appeal, Kennedy argues first that this court lacks jurisdiction. We disagree, and conclude we have jurisdiction to determine whether the trial court erred in holding Shields was not entitled to qualified immunity.
As a general rule, interlocutory appeals from determinations of qualified immunity are permissible. In Mitchell v. Forsyth, 472 U.S. 511, 530, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985), the Supreme Court held the denial of a defendant’s motion for summary judgment is immediately appeal-able where the defendant is a public official asserting the defense of qualified immunity, and the issue appealed concerns whether the facts demonstrated a violation of clearly established law.
Kennedy correctly notes that the Court created an exception to this general rule in Johnson v. Jones, 515 U.S. 304, 115 S.Ct. 2151, 132 L.Ed.2d 238 (1995). There, the Court held that “a defendant, entitled to invoke a qualified immunity defense, may not appeal a district court’s summary judgment order insofar as that order determines whether or not the pretrial record sets forth a ‘genuine’ issue of fact for trial.” Id. at 319-20, 115 S.Ct. 2151. In ruling against Shields’s motion for summary judgment based on his claim of qualified immunity, the district court stated:
Viewed in a light most favorable to plaintiffs, a jury could find that Officer Shields unreasonably created a false sense of security in plaintiffs by agreeing to give plaintiffs advance notice of advising the Burns family of the allegation that Michael Burns had sexually molested [Kennedy’s daughter], and assuring the plaintiffs of a neighborhood patrol.... In essence there is a question of fact as to whether or not there was justifiable reliance by plaintiffs on the alleged promises by Shields.
Order, at 4-5. Thus, the district court’s order observes that issues of fact remain.
However, this does not suffice to deprive us of jurisdiction under Johnson. In a *1060 subsequent case, the Supreme Court explained:
Denial of summary judgment often includes a determination that there are controverted issues of material fact, see Fed. Rule Civ. Proc. 56, and Johnson surely does not mean that every such denial of summary judgment is nonap-pealable. Johnson held, simply, that determinations of evidentiary sufficiency at summary judgment are not immediately appealable merely because they happen to arise in a qualified-immunity case.... Johnson reaffirmed that summary judgment determinations are appealable when they resolve a dispute concerning an ‘abstract issu[e] of law1 relating to qualified immunity ... typically, the issue whether the federal right allegedly infringed was ‘clearly established.’
Behrens v. Pelletier, 516 U.S. 299, 312-13, 116 S.Ct. 834, 133 L.Ed.2d 773 (1996); see also Knox v. Southwest Airlines, 124 F.3d 1103,1107 (9th Cir.1997) (“[W]e have jurisdiction over an interlocutory appeal from the denial of qualified immunity where the appeal focuses on whether the defendants violated a clearly established law given the undisputed facts, while we do not have jurisdiction over an interlocutory appeal that focuses on whether there is a genuine dispute about the underlying facts.”).
Unlike the appeal in Johnson, we are neither asked nor required to look at the sufficiency of the evidence in support of the factual claims made by the parties, i.e., Shields’s contention that he did not create a false sense of security, and Kennedy’s insistence that he did. See Johnson, 515 U.S. at 313, 115 S.Ct. 2151 (holding that some orders denying summary judgment, “though entered in a ‘qualified immunity’ case, determine[ ] only a question of ‘evidence sufficiency,’ i.e., which facts a party may, or may not, be able to prove at trial. This kind of order, we conclude, is not appealable.”).
While the district court concluded that issues of fact remain, those disputed facts are not the basis of Shields’s interlocutory appeal before this court. Rather, Shields contends that, even after resolving the issues of fact in Kennedy’s favor, Kennedy will not have demonstrated that Shields violated her clearly established, constitutional right. Because this question represents an “abstract issue of law relating to qualified immunity,” it falls within our jurisdiction on interlocutory appeal.
Assuming as true the facts adduced by Kennedy, then, we must determine whether Shields violated her constitutional rights and whether those rights were clearly established. Officer Shields is entitled to qualified immunity unless we resolve both issues in the affirmative. We now turn to those questions.
B. Application of Qualified Immunity to Officer Shields
In Saucier v. Katz, 533 U.S. 194, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001), the Supreme Court established a two-prong analysis for qualified immunity cases. First, a court must determine whether— resolving all disputes of fact and credibility in favor of the party asserting the injury— the facts adduced at summary judgment show that the officer’s conduct violated a constitutional right. Saucier, 533 U.S. at 201, 121 S.Ct. 2151. If the court determines that the conduct did not violate a constitutional right, the inquiry is over and the officer is entitled to qualified immunity-
However, if the court determines that the conduct did violate a constitutional right, Saucier’s second prong requires the court to determine whether, at the time of the violation, the constitutional right was “clearly established.” Id. A right is clearly established if its “contours” are “sufficiently clear that a reasonable official *1061 would understand that what he is doing violates that right.” Id. (citing Anderson v. Creighton, 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987)). Even if the violated right is clearly established, the Saucier Court recognized that, in certain situations, it may be difficult for a police officer to determine how to apply the relevant legal doctrine to the particular circumstances he or she faces. It held, therefore, that if an officer makes a mistake in applying the relevant legal doctrine, he or she is not precluded from claiming qualified immunity so long as the mistake is reasonable. That is, if “the officer’s mistake as to what the law requires is reasonable, ... the officer is entitled to the immunity defense.” Id. at 205, 121 S.Ct. 2151.
1. First Prong: Did Shields Violate Kennedy’s Constitutional Rights?
Kennedy alleges that Shields violated her Fourteenth Amendment right to substantive due process by placing her in a known danger with deliberate indifference to her personal, physical safety.
It is well established that the Constitution protects a citizen’s liberty interest in her own bodily security. See, e.g., Ingraham v. Wright, 430 U.S. 651, 673-74, 97 S.Ct. 1401, 51 L.Ed.2d 711 (1977); Wood v. Ostrander, 879 F.2d 583, 589 (9th Cir.1989). It is also well established that, although the state’s failure to protect an individual against private violence does not generally violate the guarantee of due process, it can where the state action “affirmatively plaee[s] the plaintiff in a position of danger,” that is, where state action creates or exposes an individual to a danger which he or she would not have otherwise faced. DeShaney v. Winnebago County Dep’t of Soc. Serv., 489 U.S. 189, 197, 201, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989); Wood, 879 F.2d at 589-90.[1]
*1062 This circuit first' recognized such “danger creation” liability in Wood v. Ostran-der, 879 F.2d 583 (9th Cir.1989). In Wood, a state trooper determined that the driver of an automobile was intoxicated, arrested the driver and impounded the car. The officer’s actions allegedly left Wood, a female passenger, stranded late at night in a known high-crime area. Subsequently, Wood accepted a ride from a passing car and was raped. This court held that Wood could claim § 1983 liability, since a jury presented with the above facts could find “that [the trooper] acted with deliberate indifference to Wood’s interest in personal security under the fourteenth amendment.” Id. at 588.
Since Wood, this circuit has held state officials liable, in a variety of circumstances, for their roles in creating or exposing individuals to danger they otherwise would not have faced. See L.W. v. Grubbs, 974 F.2d 119 (9th Cir.1992) (“Grubbs ”) (holding state employees could be liable for the rape of a registered nurse assigned to work alone in the medical clinic of a medium-security custodial institution with a known, violent sex-offender); Penilla v. City of Huntington Park, 115 F.3d 707 (9th Cir.1997) (holding as viable a state-created danger claim against police officers who, after finding a man in grave need of medical care, cancelled a request for paramedics and locked him inside his house); Munger v. City of Glasgow, 227 F.3d 1082 (9th Cir.2000) (holding police officers could be held liable for the hypothermia death of a visibly drunk patron after ejecting him from a bar on a bitterly cold night). These cases clearly establish that state actors may be held liable “where they affirmatively place an individual in danger,” Munger, 227 F.3d at 1086, by acting with “deliberate indifference to [a] known or obvious danger in subjecting the plaintiff to it,” L.W. v. Grubbs, 92 F.3d 894, 900 (9th Cir.1996) (“Grubbs II”).[2]
a. Danger Affirmatively Created Due to State Action
“In examining whether an officer affirmatively places an individual in danger, we do not look solely to the agency of the individual, nor do we rest our opinion on what options may or may not have been available to the individual. Instead, we examine whether the officer! ] left the person in a situation that was more dangerous than the one in which they found him.” Munger, 227 F.3d at 1086. Thus, we ask *1063 first whether, as alleged, any affirmative actions by Shields placed Kennedy in danger that she otherwise would not have faced. Interpreting the facts in a manner most favorable to Kennedy, we conclude they did.
Shields drove to the Burns residence and notified the Burns family of the allegations against Michael. In doing so, he affirmatively created a danger to Kennedy she otherwise would not have faced, i.e., that Michael Burns would be notified of the allegations before the Kennedys had the opportunity to protect themselves from his violent response to the news. Like plaintiffs supervisor in Grubbs, Shields created “an opportunity for [Burns] to assault[the Kennedys] that otherwise would not have existed,” Grubbs, 974 F.2d at 121.
The dissent’s assertion, infra at 1076, that “[n]otifying Michael Burns was an inevitable consequence of Kennedy’s allegations of child molestation” is an impermissible inference from the facts.[3] More importantly, it is beside the point. The only relevant question here is whether Shields, by informing Burns of Kennedy’s allegations without first warning her as he had promised to do, realized the “inevitable consequence” about which the dissent speculates. We find that, in doing so, Shields affirmatively created an actual, particularized danger Kennedy would not otherwise have faced. The existence of this danger does not depend, as the dissent repeatedly suggests, infra at 1075 n. 5, 1075, on a difference of fifteen-minutes to which we give unwarranted constitutional magnitude. That Shields notified Kennedy of the danger he had created fifteen minutes before did not obviate or cure that danger; nor did.it give Kennedy a reasonable opportunity to protect her family from it.
In addition, we must accept Kennedy’s evidence that Shields assured her early in the evening of September 24 that, given the threat Michael posed, the police would patrol the neighborhood that night. As in Grubbs, we do not rest our judgment that Shields affirmatively created a danger on that assurance alone, though in light of it, it is quite reasonable that the Kennedys decided late that night, when Mr. Kennedy returned from his class, to remain at home., Instead, as it did in Grubbs, Shields’s misrepresentation as to the risk the Kennedys faced was an additional and aggravating factor, making them more vulnerable to the danger he had already created. See Grubbs, 974 F.2d at 121 (“The Defendants also enhanced L.W.’s vulnerability to attack by misrepresenting to her the risks attending her work.”).[4]
*1064 b. Deliberate Indifference
We must decide the related issues of whether the danger to which Shields exposed the Kennedys was known or obvious, and whether he acted with deliberate indifference to it. See Bryan County v. Brown, 520 U.S. 397, 410, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997) (“ ‘[Deliberate indifference’ is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his actions.”); Christie v. Iopa, 176 F.3d 1231, 1240 (9th Cir.1999). Again, we look at the alleged facts in the light most favorable to Kennedy.
Kennedy has shown that, at their original meeting, she told Shields in detail of Michael Burns’s violent tendencies, including several incidents of what can only be described as alarming, aggravated violence, notably, lighting a cat on fire and assaulting his girlfriend with a baseball bat after breaking into her house. Additionally, she has testified that, after learning of Burns’s violent behavior, Shields assured her that she would be given notice prior to any police contact with the Burns family. Kennedy also testified that between September 6 and 24, she left several messages with the police department and the CÁIC in which she expressed continued fear for her family’s safety and refreshed her concern that she be given notice before the Burns family was notified in the course of the investigation.
On September 24, Shields knew that Michael was violent. Moreover, .he knew that Michael had broken into his girlfriend’s house and beaten her with a baseball bat. On the facts alleged, it was obvious that Michael had a predilection for violence and was capable of the attack he in fact perpetrated on the Kennedys.[5] Indeed, Burns’s attack was the very act Kennedy had repeatedly warned Shields of, and had sought to protect her family against. Thus, we are convinced that Shields knew that telling Burns about the allegations against him without forewarning the Kennedy’s would place them in a danger they otherwise would not have faced.
Kennedy also adduced sufficient evidence for us to conclude that, if such evidence is accepted by the fact finder as true, Shields acted with deliberate indifference to the known and obvious danger we have just described. In Grubbs II, we clarified the mental state required in state-created danger cases. See 92 F.3d at 896. Despite its use of the term “deliberate indifference,” Wood had been interpretéd to have established a “ ‘bare’ gross negligence” standard. Id. at 897-98. In Grubbs II, after surveying the standards of our sister circuits, we made clear that the standard in this circuit was not gross negligence but “deliberate indifference to a known, or so obvious as to imply knowledge of, danger.” Id. at 900. We explicitly said that such a mental state “is enough” — no more, no less. Moreover, we refused to parse it further, explaining, “[w]e have not added a requirement that the conscience of the federal judiciary be shocked by deliberate indifference, be *1065 cause the use of such subjective epithets as ‘gross’ ‘reckless’ and ‘shocking’ sheds more heat than light on the thought process courts must undertake in cases of this kind.”[6] Id.
Viewing the facts in the light most favorable to Kennedy, we find that, if accepted as true, they are sufficient to establish that Shields acted deliberately and indifferently to the danger he was creating. Kennedy warned Shields repeatedly about Burns and requested that Shields notify her first so she could protect her family. With knowledge of Burns’s propensity for violence and of Kennedy’s fear, and despite his promise to Kennedy to the contrary, Shields nevertheless notified Burns first. Of all the possible actions he could take, and pursuant to no investigatory duties, he took the one most feared by Kennedy. His only explanation for his action is that it was a more convenient way in which to answer an administrative phone message. Then, after notifying Burns, Shields allegedly reassured the visibly frightened Kennedy of increased security which was either never provided or plainly ineffective. Given the danger created by Shields that the Kennedys faced, we find such alleged, capricious behavior sufficient evidence of deliberate indifference.
2. Second Prong: Was the Right Violated Clearly Established?
We turn now to the second prong of Saucier, which Plaintiff has the burden of establishing. See Sorrels v. McKee, 290 F.3d 965, 969 (9th Cir.2002). We consider whether Kennedy has shown that the constitutional right violated by Shields was “clearly established” in September 1998. For the reasons below, we conclude she has.
To determine whether a right is clearly established, the reviewing court must consider whether a reasonable officer would recognize that his or her conduct violates that right under the circumstances faced, and in light of the law that existed at that time. Saucier, 533 U.S. at 202, 121 S.Ct. 2151. As the Supreme Court has explained:
For a constitutional right to be clearly established, its contours must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful ... but it is to say that in the light of pre-existing law the unlawfulness must be apparent.
Hope v. Pelzer, 536 U.S. 730, 739, 122 S.Ct. 2508, 153 L.Ed.2d 666 (2002) (citing Anderson v. Creighton, 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987)) (internal citations omitted). However, “[i]n order to find that the law was clearly established ... we need not find a prior case with identical, or even ‘materially similar’ facts. Our task is to determine whether the preexisting law provided the defendants with ‘fair warning’ that their conduct was unlawful.” Flores v. Morgan Hill Unified Sch. Dist., 324 F.3d 1130, 1136-37 (9th Cir.2003) (citing Hope, 536 U.S. at 740, 122 S.Ct. 2508).
Thus, the specific, alleged conduct in this case need not have been previously and explicitly deemed unconstitutional, but existing case law must have made it clear *1066 that the conduct violated constitutional norms. This has been our consistent standard since Wood. See Wood, 879 F.2d at 592 (“[Defendant] seemingly suggests that this case can be disposed of if it does not bear a strict factual similarity to previous cases finding liability. However this crabbed view of the good faith immunity principle cannot withstand analysis.” (citing Anderson, 483 U.S. at 640, 107 S.Ct. 3034).).
It is beyond dispute that in September 1998, it was clearly established that state officials could be held liable where they affirmatively and with deliberate indifference placed an individual in danger she would not otherwise have faced. This court first recognized the theory of state-created danger liability almost ten years before the events in this case in Wood. In the interim, we published three decisions explicitly recognizing such liability under three distinct factual scenarios.[7] See Grubbs, 974 F.2d 119; Koon, 34 F.3d 1416; Penilla, 115 F.3d 707. Indeed, almost three years before the actions at issue in this case, we concluded “the law was clearly established that officers may be liable where they affirmatively place an individual in danger.” See Munger, 227 F.3d at 1086.[8] We have explained before that the responsibility for keeping abreast of constitutional developments rests “squarely on the shoulders of law enforcement officials. Given the power of such officials over our liberty, and sometimes over our lives, this placement of responsibility is entirely proper.” Wood, 879 F.2d at 595 (quoting Ward v. County of San Diego, 791 F.2d 1329, 1332 (9th Cir.1986)). We conclude that no reasonable officer in Shields’s position, knowing what he knew, could have concluded that Kennedy had no right not to be placed in physical danger by his deliberately indifferent action.
Indeed, even were we to engage in an examination of our case law with the finer resolution encouraged by the dissent, we conclude that, as to the state-creation of danger, this case is not “meaningfully distinguishable” from Grubbs. See Wood, 879 F.2d at 593. In Grubbs, a registered *1067 nurse working at a medium security custodial institution brought a § 1983 claim against her supervisors after she was allegedly raped and terrorized by a young male inmate. According to the plaintiff, her employer had told her she would not be working alone with violent sex offenders. Notwithstanding that representation, her employer subsequently allowed an inmate prone to violence against women to work with her unsupervised. The plaintiff, relying upon that representation, did not take all the precautions she might otherwise have taken, and was subsequently assaulted.
In Grubbs, as in this case, a state official affirmatively acted: supervisor Grubbs assigned a violent sex offender to work closely with L.W., and Officer Shields notified Burns, leaving Kennedy unable to protect her family. In Grubbs, as in this case, those state actions left plaintiffs exposed to the danger of the subsequent physical assault and injury they in fact suffered. And in both cases the plaintiff relied upon the state actor’s representation and did not take protective measures she otherwise would have taken, and the state’s action made plaintiffs vulnerable to a particularized danger they would not have faced but for that action.
Indeed, in this case, as in Grubbs, Shields used his “authority as a state ... officer to create an opportunity for [Burns] to assault [Kennedy] that would not have otherwise existed.” Grubbs, 974 F.2d at 121. Moreover, Kennedy, like L.W., “is not seeking to hold Defendant ] liable for [Burns’s] violent proclivities. Rather, [she] seeks to make Defendant] answer for [his] acts that independently created the opportunity for and facilitated [Burns’s] assault on her.” Id. at 122. At bottom Kennedy’s claim is exactly like L.W.’s, i.e., that a state actor “enhanced [her] vulnerability to attack by misrepresenting to her the risks” she faced. Id. at 121. No reasonable officer in Shields’s position, knowing what he allegedly knew and what he must be charged with knowing, could have concluded otherwise than that Kennedy had a right not to be placed in obvious physical danger as a result of his deliberately indifferent action.
III. CONCLUSION
Under Behrens, 516 U.S. at 312-13, 116 S.Ct. 834, we have jurisdiction to hear Shields’s interlocutory appeal regarding qualified immunity. On the merits, we conclude that, on this summary judgment record, Shields unreasonably violated Kennedy’s clearly established constitutional right. Under the state-created danger doctrine, a police officer may be liable for actions that create or increase a known or obvious danger to an individual that he or she would otherwise not face. Because we hold that this doctrine was clearly established at the time the events of this case took place, and that Shields’s actions both created and aggravated the risk Plaintiff faced from Burns on the night of September 24, 1998, the district court’s denial of Shields’s motion for summary judgment based on qualified immunity is
AFFIRMED.

. The dissent suggests that this court created such liability in Wood by glossing DeShaney. See infra, at 2254-56. In fact, the "state-created danger” doctrine predates DeShaney. See, e.g., White v. Rockford, 592 F.2d 381, 384 (7th Cir. 1979) ("[T]he complaint sufficiently alleged a deprivation of rights secured by the Constitution sufficient to state a claim under § 1983.... [I]t is sufficient that the defendants left helpless minor children subject to inclement weather and great physical danger without any apparent justification.”); Bowers v. De Vito, 686 F.2d 616, 618 (7th Cir.1982) (“If the state puts a man in a position of danger from private persons and then fails to protect him, it will not be heard to say that its role was merely passive; it is as much an active tortfeasor as if it had thrown him into a snake pit.”); Wells v. Walker, 852 F.2d 368, 370-71 (8th Cir.1988) ("Circuit court decisions examining whether a particular individual, as distinguished from the general public, is entitled to protection by the state from third-party harm generally recognize that the due process clause may be implicated in the following situation[ ] ... when the state affirmatively places a particular individual in a position of danger the individual would not otherwise have been in.”) (citations omitted). See also David Pruessner, The Forgotten Foundation of State-Created Danger Claims, 20 Rev. Litig. 357 (2001) (tracing the modern doctrine to its roots in the statutory language and legislative history of the civil rights legislation originally enacted as the Ku Klux Klan Act of 1871, now codified as 42 U.S.C. § 1983). The oft-cited language of DeShaney, 489 U.S. at 201, 109 S.Ct. 998, is thus more reasonably understood as an acknowledgment and preservation of the doctrine, rather than its source.
Moreover, the doctrine is not particular to our court. It is well established law in seven of our sister circuits. Butera v. District of Columbia, 235 F.3d 637, 651 (D.C.Cir.2001); Dwares v. City of New York, 985 F.2d 94, 98-99 (2nd Cir.1993); Kneipp v. Tedder, 95 F.3d 1199, 1201 (3d Cir.1996); Kallstrom v. City of Columbus, 136 F.3d 1055, 1066-67 (6th Cir. 1998); Reed v. Gardner, 986 F.2d 1122, 1125 (7th Cir.1993); Freeman v. Ferguson, 911 F.2d 52, 54-55 (8th Cir. 1990); Uhlrig v. Harder, 64 F.3d 567, 572 (10th Cir.1995).

. We disagree with the dissent’s characterization of the factors for analysis our case law prescribes, infra at 1073-74. While it is proper’ to consider whether the conduct at issue was an affirmative act or an omission, whether it ivas directed toward the plaintiff specifically, and whether it was done with deliberate indifference to a known or obvious danger, we have never required, as the dissent suggests, infra at 1073, that the "government's act caused the harm” suffered by plaintiff. Instead, our "state-created danger” cases clearly contemplate § 1983 liability for the state actor who, though not inflicting plaintiff's injury himself, has placed plaintiff in the harmful path of a third party not liable under § 1983. See United States v. Koon, 34 F.3d 1416, 1447-48 (9th Cir.1994) ("The right which is established in these substantive due process cases is not the narrow right to be protected from constitutional wrongs committed by third persons. Rather, because the individual has been placed in a dependent and helpless position, she is entitled to the broader right to be protected from harm. In ... Grubbs, and in Wood, the third persons who inflicted the victims' injuries, in fact, were not state actors. They were private citizens whose own actions could not have given rise to liability under ... § 1983. The state actors — the defendants who failed to intervene, or who created the danger — were alone responsible for constitutional crimes or torts.”). Accordingly, we disagree with the dissent's assertion, infra at 1075, that the state actor must be the "cause-in-fact of the plaintiff's injury.” Rather, the’ state actor need only have created the particularized risk that plaintiff might suffer such injury.

. In fact record evidence clearly leads to the opposite inference. See, e.g., Appellee’s Supplemental Excerpts of the Record at 88 (recording deposition testimony of a CAIC investigator: "Q: Do you receive any training as far as the timing when it's best to contact an offender? A: At the end of the investigation. You need to have all your facts in order. Q: So by that you mean ... that would be like the last step? A: Yes. Q: Why is that? A: Well, because you can’t tell when they’re lying to you.... Q: Is there a situation where you've been trained it’s good to contact the offender before the end of the investigation? A: The only time would be is if there was some sense of urgency, something that was emergent.’’). In light of such evidence, the dissent’s speculation, infra at 1076 n. 6, that the only reason for late notification is to allow a questioning officer to assess the offender's credibility amounts to another impermissible inference drawn in Shields’s rather than Kennedy's favor.

. We note this court has already specifically rejected the "danger creation” versus "danger enhancement” distinction the dissent raises, infra at 1076- 1077. See Penilla, 115 F.3d at 710 ("The critical distinction is not, as appellants allege, an indeterminate line between danger creation and enhancement, but rather the stark one between state action and inaction in placing an individual at risk.”).

. The dissent, infra at 1078, again appears to confuse the standard established in our case law by requiring foreseeability of the specific injury Burns in fact inflicted on the Kennedys, rather than foreseeability of the danger of such injury that Shields created. We have never required that, for a danger to exist, the exact injury inflicted by a third party must have been foreseeable. Instead, the state actor is liable for creating the foreseeable danger of injury given the particular circumstances. For example, in Wood, we did not speculate, nor require, that Trooper Ostran-der foreseeably knew Wood would in fact be raped by a passing motorist. We held he could be liable, however, for leaving Wood in a situation more dangerous than the one she already faced, i.e., for stranding her alone in a known high-crime area at 2:30 a.m. See Wood, 879 F.2d at 590.

. Citing language from our Grubbs II survey of other circuits, the dissent appears to suggest Shields was required to have a mental state closer to the specific intent of exposing Kennedy to the actual injury Burns inflicted. See infra at 1077-1078 We disagree. Grubbs II requires no more and no less than “deliberate indifference" to the danger in question. 92 F.3d at 900.

. The dissent, claiming to follow the requirements of Saucier, infra at 1079, attempts to show through an elaborate fact-matching exercise that none of our state-created danger cases clearly enough established the requisite notice. We consider the exercise misguided and, as discussed below, analytically flawed. An exact factual predicate case has never been required to find a right clearly established. Indeed, Flores made it clear that not even materially similar facts were necessarily required. See 324 F.3d at 1136-37. All a plaintiff need show is that a reasonable person would have understood from the case law that his actions would violate another's constitutional rights. Hope, 536 U.S. at 739, 122 S.Ct. 2508 (citing Anderson, 483 U.S. at 640, 107 S.Ct. 3034). For excessive force cases, like Saucier and Brosseau v. Haugen, 543 U.S. 194, 125 S.Ct. 596, 160 L.Ed.2d 583 (2004), a somewhat more detailed analysis of the factual context is necessary because of what the Supreme Court deemed the "hazy border between excessive and acceptable force." See Saucier, 533 U.S. at 205-6, 121 S.Ct. 2151. For the case at hand, however, the factual scenarios in Wood, Grubbs, Koon, and Penilla were sufficient to clearly establish the following: a reasonable officer with Shields’s knowledge would have understood that informing Burns about Kennedy’s allegations— before adequately warning the Kennedys— would put them in greater danger than they otherwise would have faced that night.

. We note that the Fifth Circuit looking only to our decisions in Wood and Grubbs considered the state-created danger theory "clearly established” in this circuit under Saucier as early as 1993. See McClendon v. City of Columbia, 305 F.3d 314, 330, 324-25 (5th Cir. 2002) (identifying courts that had accepted “some version of this 'state-created danger' theory”); id. at 328 n. 10 (recognizing that "if this court had expressly adopted or rejected the state-created danger theory prior to[the incident date] that would, of course, be the end of our inquiry.”).