# BROSSEAU *v.* HAUGEN

No. 03–1261. Decided December 13, 2004

PER CURIAM.

Officer Rochelle Brosseau, a member of the Puyallup, Washington, Police Department, shot Kenneth Haugen in the back as he attempted to flee from law enforcement authorities in his vehicle. Haugen subsequently filed this action in the United States District Court for the Western District of

Washington pursuant to Rev. Stat. § 1979, 42 U. S. C. § 1983. He alleged that the shot fired by Brosseau constituted excessive force and violated his federal constitutional rights.[1] The District Court granted summary judgment to Brosseau after finding she was entitled to qualified immunity. The Court of Appeals for the Ninth Circuit reversed. 339 F. 3d 857 (2003). Following the two-step process set out in *Saucier* v. *Katz*, 533 U. S. 194 (2001), the Court of Appeals found, first, that Brosseau had violated Haugen's Fourth Amendment right to be free from excessive force and, second, that the right violated was clearly established and thus Brosseau was not entitled to qualified immunity. Brosseau then petitioned for writ of certiorari, requesting that we review both of the Court of Appeals' determinations. We grant the petition on the second, qualified immunity question and reverse.

The material facts, construed in a light most favorable to Haugen, are as follows.[2] On the day before the fracas, Glen Tamburello went to the police station and reported to Brosseau that Haugen, a former crime partner of his, had stolen tools from his shop. Brosseau later learned that there was a felony no-bail warrant out for Haugen's arrest on drug and other offenses. The next morning, Haugen was spray painting his Jeep Cherokee in his mother's driveway. Tamburello learned of Haugen's whereabouts, and he and cohort Matt Atwood drove a pickup truck to Haugen's mother's house to pay Haugen a visit. A fight ensued, which was witnessed by a neighbor who called 911.

Brosseau heard a report that the men were fighting in Haugen's mother's yard and responded. When she arrived, Tamburello and Atwood were attempting to get Haugen into

---

[1] Haugen also asserted pendent state-law claims and claims against the city and police department. These claims are not presently before us.

[2] Because this case arises in the posture of a motion for summary judgment, we are required to view all facts and draw all reasonable inferences in favor of the nonmoving party, Haugen. See *Saucier* v. *Katz*, 533 U. S. 194, 201 (2001).

Tamburello's pickup. Brosseau's arrival created a distraction, which provided Haugen the opportunity to get away. Haugen ran through his mother's yard and hid in the neighborhood. Brosseau requested assistance, and, shortly thereafter, two officers arrived with a K–9 to help track Haugen down. During the search, which lasted about 30 to 45 minutes, officers instructed Tamburello and Atwood to remain in Tamburello's pickup. They instructed Deanna Nocera, Haugen's girlfriend who was also present with her 3-year-old daughter, to remain in her small car with her daughter. Tamburello's pickup was parked in the street in front of the driveway; Nocera's small car was parked in the driveway in front of and facing the Jeep; and the Jeep was in the driveway facing Nocera's car and angled somewhat to the left. The Jeep was parked about 4 feet away from Nocera's car and 20 to 30 feet away from Tamburello's pickup.

An officer radioed from down the street that a neighbor had seen a man in her backyard. Brosseau ran in that direction, and Haugen appeared. He ran past the front of his mother's house and then turned and ran into the driveway. With Brosseau still in pursuit, he jumped into the driver's side of the Jeep and closed and locked the door. Brosseau believed that he was running to the Jeep to retrieve a weapon.

Brosseau arrived at the Jeep, pointed her gun at Haugen, and ordered him to get out of the vehicle. Haugen ignored her command and continued to look for the keys so he could get the Jeep started. Brosseau repeated her commands and hit the driver's side window several times with her handgun, which failed to deter Haugen. On the third or fourth try, the window shattered. Brosseau unsuccessfully attempted to grab the keys and struck Haugen on the head with the barrel and butt of her gun. Haugen, still undeterred, succeeded in starting the Jeep. As the Jeep started or shortly after it began to move, Brosseau jumped back and to the left. She fired one shot through the rear driver's side window

at a forward angle, hitting Haugen in the back. She later explained that she shot Haugen because she was "'fearful for the other officers on foot who [she] believed were in the immediate area, [and] for the occupied vehicles in [Haugen's] path and for any other citizens who might be in the area.'" 339 F. 3d, at 865.

Despite being hit, Haugen, in his words, "'st[ood] on the gas'"; navigated the "'small, tight space'" to avoid the other vehicles; swerved across the neighbor's lawn; and continued down the street. *Id.*, at 882. After about a half block, Haugen realized that he had been shot and brought the Jeep to a halt. He suffered a collapsed lung and was airlifted to a hospital. He survived the shooting and subsequently pleaded guilty to the felony of "eluding." Wash. Rev. Code § 46.61.024 (1994). By so pleading, he admitted that he drove his Jeep in a manner indicating "a wanton or wilful disregard for the lives . . . of others." *Ibid.* He subsequently brought this § 1983 action against Brosseau.

\* \* \*

When confronted with a claim of qualified immunity, a court must ask first the following question: "Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?" *Saucier* v. *Katz,* 533 U. S., at 201. As the Court of Appeals recognized, the constitutional question in this case is governed by the principles enunciated in *Tennessee* v. *Garner,* 471 U. S. 1 (1985), and *Graham* v. *Connor,* 490 U. S. 386 (1989). These cases establish that claims of excessive force are to be judged under the Fourth Amendment's "'objective reasonableness'" standard. *Id.,* at 388. Specifically with regard to deadly force, we explained in *Garner* that it is unreasonable for an officer to "seize an unarmed, nondangerous suspect by shooting him dead." 471 U. S., at 11. But "[w]here the officer has probable cause to believe that the suspect poses a threat of serious physical

harm, either to the officer or to others, it is not constitutionally unreasonable to prevent escape by using deadly force."
*Ibid.*

We express no view as to the correctness of the Court of Appeals' decision on the constitutional question itself. We believe that, however that question is decided, the Court of Appeals was wrong on the issue of qualified immunity.[3]

Qualified immunity shields an officer from suit when she makes a decision that, even if constitutionally deficient, reasonably misapprehends the law governing the circumstances she confronted. *Saucier* v. *Katz,* 533 U. S., at 206 (qualified immunity operates "to protect officers from the sometimes 'hazy border between excessive and acceptable force'"). Because the focus is on whether the officer had fair notice that her conduct was unlawful, reasonableness is judged against the backdrop of the law at the time of the conduct. If the law at that time did not clearly establish that the officer's conduct would violate the Constitution, the officer should not be subject to liability or, indeed, even the burdens of litigation.

It is important to emphasize that this inquiry "must be undertaken in light of the specific context of the case, not as a broad general proposition." *Id.,* at 201. As we previously said in this very context:

> "[T]here is no doubt that *Graham* v. *Connor, supra,* clearly establishes the general proposition that use of force is contrary to the Fourth Amendment if it is excessive under objective standards of reasonableness. Yet that is not enough. Rather, we emphasized in *Anderson* [v. *Creighton*] 'that the right the official is alleged to have violated must have been "clearly established" in

---

[3] We have no occasion in this case to reconsider our instruction in *Saucier* v. *Katz, supra,* that lower courts decide the constitutional question prior to deciding the qualified immunity question. We exercise our summary reversal procedure here simply to correct a clear misapprehension of the qualified immunity standard.

a more particularized, and hence more relevant, sense: The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.' 483 U. S. [635,] 640 [(1987)]. The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Id.*, at 201–202.

The Court of Appeals acknowledged this statement of law, but then proceeded to find fair warning in the general tests set out in *Graham* and *Garner*. 339 F. 3d, at 873–874. In so doing, it was mistaken. *Graham* and *Garner*, following the lead of the Fourth Amendment's text, are cast at a high level of generality. See *Graham* v. *Connor, supra*, at 396 (" '[T]he test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application' "). Of course, in an obvious case, these standards can "clearly establish" the answer, even without a body of relevant case law. See *Hope* v. *Pelzer*, 536 U. S. 730, 738 (2002) (noting in a case where the Eighth Amendment violation was "obvious" that there need not be a materially similar case for the right to be clearly established). See also *Pace* v. *Capobianco*, 283 F. 3d 1275, 1283 (CA11 2002) (explaining in a Fourth Amendment case involving an officer shooting a fleeing suspect in a vehicle that, "when we look at decisions such as *Garner* and *Graham*, we see some tests to guide us in determining the law in many different kinds of circumstances; but we do not see the kind of clear law (clear answers) that would apply" to the situation at hand). The present case is far from the obvious one where *Graham* and *Garner* alone offer a basis for decision.

We therefore turn to ask whether, at the time of Brosseau's actions, it was " " "clearly established" ' " in this more " 'particularized' " sense that she was violating Haugen's Fourth Amendment right. *Saucier* v. *Katz*, 533 U. S., at

202.   The parties point us to only a handful of cases relevant to the "situation [Brosseau] confronted": whether to shoot a disturbed felon, set on avoiding capture through vehicular flight, when persons in the immediate area are at risk from that flight.[4]   *Ibid.*   Specifically, Brosseau points us to *Cole* v. *Bone,* 993 F. 2d 1328 (CA8 1993), and *Smith* v. *Freland,* 954 F. 2d 343 (CA6 1992).

In these cases, the courts found no Fourth Amendment violation when an officer shot a fleeing suspect who presented a risk to others.   *Cole* v. *Bone, supra,* at 1333 (holding the officer "had probable cause to believe that the truck posed an imminent threat of serious physical harm to innocent motorists as well as to the officers themselves"); *Smith* v. *Freland,* 954 F. 2d, at 347 (noting "a car can be a deadly weapon" and holding the officer's decision to stop the car from possibly injuring others was reasonable).   *Smith* is closer to this case.   There, the officer and suspect engaged in a car chase, which appeared to be at an end when the officer cornered the suspect at the back of a dead-end residential street.   The suspect, however, freed his car and began speeding down the street.   At this point, the officer fired a shot, which killed the suspect.   The court held the officer's decision was reasonable and thus did not violate the Fourth Amendment.   It noted that the suspect, like Haugen here, "had proven he would do almost anything to avoid capture" and that he posed a major threat to, among others, the officers at the end of the street.   *Ibid.*

---

[4] The parties point us to a number of other cases in this vein that postdate the conduct in question, *i. e.,* Brosseau's February 21, 1999, shooting of Haugen.   See *Cowan ex rel. Estate of Cooper* v. *Breen,* 352 F. 3d 756, 763 (CA2 2003); *Pace* v. *Capobianco,* 283 F. 3d 1275, 1281–1282 (CA11 2002); *Scott* v. *Clay County,* 205 F. 3d 867, 877 (CA6 2000); *McCaslin* v. *Wilkins,* 183 F. 3d 775, 778–779 (CA8 1999); *Abraham* v. *Raso,* 183 F. 3d 279, 288–296 (CA3 1999).   These decisions, of course, could not have given fair notice to Brosseau and are of no use in the clearly established inquiry.

Haugen points us to *Estate of Starks* v. *Enyart*, 5 F. 3d 230 (CA7 1993), where the court found summary judgment inappropriate on a Fourth Amendment claim involving a fleeing suspect. There, the court concluded that the threat created by the fleeing suspect's failure to brake when an officer suddenly stepped in front of his just-started car was not a sufficiently grave threat to justify the use of deadly force. *Id.*, at 234.

These three cases taken together undoubtedly show that this area is one in which the result depends very much on the facts of each case. None of them squarely governs the case here; they do suggest that Brosseau's actions fell in the "'hazy border between excessive and acceptable force.'" *Saucier* v. *Katz, supra,* at 206. The cases by no means "clearly establish" that Brosseau's conduct violated the Fourth Amendment.

The judgment of the United States Court of Appeals for the Ninth Circuit is therefore reversed, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

JUSTICE BREYER, with whom JUSTICE SCALIA and JUSTICE GINSBURG join, concurring.

I join the Court's opinion but write separately to express my concern about the matter to which the Court refers in footnote 3, namely, the way in which lower courts are required to evaluate claims of qualified immunity under the Court's decision in *Saucier* v. *Katz*, 533 U. S. 194, 201 (2001). As the Court notes, *ante*, at 198, n. 3, *Saucier* requires lower courts to decide (1) the constitutional question prior to deciding (2) the qualified immunity question. I am concerned that the current rule rigidly requires courts unnecessarily to decide difficult constitutional questions when there is available an easier basis for the decision (*e. g.*, qualified immunity) that will satisfactorily resolve the case before the court. Indeed when courts' dockets are crowded, a rigid "order of

battle" makes little administrative sense and can sometimes lead to a constitutional decision that is effectively insulated from review, see *Bunting* v. *Mellen*, 541 U. S. 1019, 1025 (2004) (SCALIA, J., dissenting from denial of certiorari). For these reasons, I think we should reconsider this issue.

JUSTICE STEVENS, dissenting.

In my judgment, the answer to the constitutional question presented by this case is clear: Under the Fourth Amendment, it was objectively unreasonable for Officer Brosseau to use deadly force against Kenneth Haugen in an attempt to prevent his escape. What is not clear is whether Brosseau is nonetheless entitled to qualified immunity because it might not have been apparent to a reasonably well-trained officer in Brosseau's shoes that killing Haugen to prevent his escape was unconstitutional. In my opinion that question should be answered by a jury.

I

Law enforcement officers should never be subject to damages liability for failing to anticipate novel developments in constitutional law. Accordingly, whenever a suit against an officer is based on the alleged violation of a constitutional right that has not been clearly established, the qualified immunity defense is available. *Harlow* v. *Fitzgerald*, 457 U. S. 800, 818 (1982). Prompt dismissal of such actions protects officers from unnecessary litigation and accords with this Court's wise "policy of avoiding the unnecessary adjudication of constitutional questions." *County of Sacramento* v. *Lewis*, 523 U. S. 833, 859 (1998) (STEVENS, J., concurring in judgment). When, however, the applicable constitutional rule is well settled, "we should address the constitutional question at the outset." *Ibid.;* see also *Siegert* v. *Gilley*, 500 U. S. 226 (1991). The constitutional limits on the use of deadly force have been clearly established for almost two decades.

In 1985, we held that the killing of an unarmed burglar to prevent his escape was an unconstitutional seizure. *Tennessee* v. *Garner*, 471 U. S. 1. We considered, and rejected, the State's contention that the Fourth Amendment's prohibition against unreasonable seizures should be construed in light of the common-law rule, which allowed the use of whatever force was necessary to effectuate the arrest of a fleeing felon. *Id.*, at 12–13. We recognized that the common-law rule had been fashioned "when virtually all felonies were punishable by death" and long before guns were available to the police, and noted that modern police departments in a majority of large cities allowed the firing of a weapon only when a felon presented a threat of death or serious bodily harm. *Id.*, at 13–19. We concluded that "changes in the legal and technological context" had made the old rule obsolete. *Id.*, at 15.

Unlike most "excessive force" cases in which the degree of permissible force varies widely from case to case, the only issue in a "deadly force" case is whether the facts apparent to the officer justify a decision to kill a suspect in order to prevent his escape.

In *Garner* we stated the governing rule:

> "The use of deadly force to prevent the escape of all felony suspects, whatever the circumstances, is constitutionally unreasonable. It is not better that all felony suspects die than that they escape. Where the suspect poses no immediate threat to the officer and no threat to others, the harm resulting from failing to apprehend him does not justify the use of deadly force to do so. . . . A police officer may not seize an unarmed, nondangerous suspect by shooting him dead. . . .
>
> "Where the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others, it is not constitutionally unreasonable to prevent escape by using deadly force. Thus, if the suspect threatens the officer with a weapon or

there is probable cause to believe that he has committed a crime involving the infliction or threatened infliction of serious physical harm, deadly force may be used if necessary to prevent escape, and if, where feasible, some warning has been given." *Id.*, at 11–12.

The most common justifications for the use of deadly force are plainly inapplicable to this case. Respondent Haugen had not threatened anyone with a weapon, and petitioner Brosseau did not shoot in order to defend herself.[1] Haugen was not a person who had committed a violent crime; nor was there any reason to believe he would do so if permitted to escape. Indeed, there is nothing in the record to suggest he intended to harm anyone.[2] The "threat of serious physical harm, either to the officer or to others," *id.*, at 11, that provides the sole justification for Brosseau's use of deadly force was the risk that while fleeing in his vehicle Haugen would accidentally collide with a pedestrian or another vehicle. Whether Brosseau's shot enhanced or minimized that risk is debatable, but the risk of such an accident surely did

---

[1] Although Brosseau attested that she believed Haugen may have been attempting to retrieve a weapon from the floorboard of his vehicle sometime during the struggle, a fact which Haugen hotly contests, there is no evidence in the record to suggest that, at the time the shot was fired, Brosseau believed, or any reasonable officer would have thought, that Haugen had access to a weapon at that moment.

[2] At the time of the shooting, Brosseau had the following facts at her disposal. Haugen had a felony no-bail warrant for a nonviolent drug offense, was suspected in a nonviolent burglary, and had been fleeing from law enforcement on foot for approximately 30 to 45 minutes without incident. At the behest of Brosseau, the private individuals on the scene were inside their respective vehicles. Haugen's girlfriend and her daughter were in a small car approximately four feet in front and slightly to the right of Haugen's Jeep; Glen Tamburello and Matt Atwood were inside a pickup truck on the street blocking the driveway, approximately 20 to 30 feet from Haugen's Jeep. The only two police officers on foot at the scene were last seen in a neighbor's backyard, two houses down and to the right of the driveway.

not justify an attempt to kill the fugitive.[3]  Thus, I have no difficulty in endorsing the Court's assumption that Brosseau's conduct violated the Constitution.

## II

An officer is entitled to qualified immunity, despite having engaged in constitutionally deficient conduct, if, in doing so, she did not violate "clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow*, 457 U. S., at 818.  The requirement that the law be clearly established is designed to ensure that officers have fair notice of what conduct is proscribed.  See *Hope* v. *Pelzer*, 536 U. S. 730, 739 (2002).  Accordingly, we have recognized that "general statements of the law are not inherently incapable of giving fair and clear warning," *United States* v. *Lanier*, 520 U. S. 259, 271 (1997), and have firmly rejected the notion that "an official action is protected by qualified immunity unless the very action in question has previously been held unlawful," *Anderson* v. *Creighton*, 483 U. S. 635, 640 (1987).

Thus, the Court's search for relevant case law applying the *Garner* standard to materially similar facts is both unnecessary and ill advised.  See *Hope*, 536 U. S., at 741 ("Although earlier cases involving 'fundamentally similar' facts can provide especially strong support for a conclusion that the law is clearly established, they are not necessary to such a finding"); see also *Lanier*, 520 U. S., at 269.  Indeed, the cases the majority relies on are inapposite and, in fact, only serve

---

[3] The evidence supporting Haugen's allegation that Brosseau did "willfully fire her weapon with the intent to murder me," 1 Record, Doc. No. 1, includes a statement by a defense expert that Brosseau had "clearly articulated her intention to use deadly force," *id.*, Doc. No. 24.  Moreover, the report of the Puyallup, Washington, Police Department Firearms Review Board stated that Brosseau "chose to use deadly force to stop Haugen." 2 *id.*, Doc. No. 27, Exh. H.

to illuminate the patent unreasonableness of Brosseau's actions.[4]

Rather than uncertainty about the law, it is uncertainty about the likely consequences of Haugen's flight—or, more precisely, uncertainty about how a reasonable officer making the split-second decision to use deadly force would have assessed the foreseeability of a serious accident—that prevents me from answering the question of qualified immunity that this case presents. This is a quintessentially "fact-specific" question, not a question that judges should try to answer "as a matter of law." Cf. *Anderson*, 483 U. S., at 641. Although it is preferable to resolve the qualified immunity question at the earliest possible stage of litigation, this preference does not give judges license to take inherently factual questions away from the jury. See *Hunter* v. *Bryant*, 502 U. S. 224, 229 (1991) *(per curiam)* (SCALIA, J., concurring in judgment); *id.*, at 233 (STEVENS, J., dissenting) ("'Whether

---

[4] In *Cole* v. *Bone*, 993 F. 2d 1328 (CA8 1993), an 18-wheel tractor-trailer sped through a tollbooth and engaged the police in a high-speed pursuit in excess of 90 miles per hour on a high-traffic interstate during the holiday season. During the course of the pursuit, the driver passed traffic on both shoulders of the interstate, repeatedly attempted to ram several police cars, drove more than 100 passenger vehicles off the road, ran through several roadblocks, and continued driving after the officer shot out the wheels of the fugitive's truck. *Id.*, at 1330–1331. Only then did the officer finally resort to deadly force to disable the driver. Similarly, in *Smith* v. *Freland*, 954 F. 2d 343 (CA6 1992), the suspect led a police officer on a high-speed chase, reaching speeds in excess of 90 miles per hour. When the officer initially cornered the suspect in a field, the driver repeatedly swerved directly toward the police car, forcing the officer to move out of the way and allowing the suspect to continue the chase. *Id.*, at 344. Only after additional officers cornered the suspect for a second time, and after the suspect smashed directly into an unoccupied police car and began to flee again, did the officer finally shoot the driver. *Ibid.*

In stark contrast, at the time Brosseau shot Haugen, the Jeep was immobile, or at best, had just started moving. Haugen had not driven at excess speeds; nor had he rammed, or attempted to ram, nearby police cars or passenger vehicles. In sum, there was no ongoing or prior high-speed car chase to inform the probable-cause analysis.

a reasonable officer could have believed he had probable cause is a question for the trier of fact, and summary judgment or a directed verdict in a § 1983 action based on [the] lack of probable cause is proper only if there is only one reasonable conclusion a jury could reach'" (quoting *Bryant* v. *U. S. Treasury Dept., Secret Service*, 903 F. 2d 717, 721 (CA9 1990))). The bizarre scenario described in the record of this case convinces me that reasonable jurors could well disagree about the answer to the qualified immunity issue. My conclusion is strongly reinforced by the differing opinions expressed by the Circuit Judges who have reviewed the record.

### III

The Court's attempt to justify its decision to reverse the Court of Appeals without giving the parties an opportunity to provide full briefing and oral argument is woefully unpersuasive. If Brosseau had deliberately shot Haugen in the head and killed him, the legal issues would have been the same as those resulting from the nonfatal wound. I seriously doubt that my colleagues would be so confident about the result as to decide the case without the benefit of briefs or argument on such facts.[5] At a minimum, the Ninth Circuit's decision was not clearly erroneous, and the extraordinary remedy of summary reversal is not warranted on these facts. See R. Stern, E. Gressman, & S. Shapiro, Supreme Court Practice 281 (6th ed. 1986).

In sum, the constitutional limits on an officer's use of deadly force have been well settled in this Court's jurisprudence for nearly two decades, and, in this case, Officer Brosseau acted outside of those clearly delineated bounds.

---

[5] The Court's recitation of the facts that led up to the shooting obscures the undisputed point that no one contends Haugen was the kind of dangerous person—perhaps a terrorist or an escaped convict on a crime spree—who would have been a danger to the community if he had been allowed to escape. The factual issues relate only to the danger that he posed while in the act of escaping.

Nonetheless, in my judgment, there is a genuine factual question as to whether a reasonably well-trained officer standing in Brosseau's shoes could have concluded otherwise, and that question plainly falls with the purview of the jury.

For these reasons, I respectfully dissent.