GARTH, Circuit Judge,
dissenting.
The overarching question that this appeal has left me with is: where, how, and when were Green’s rights in this situation “clearly established”? How would a reasonable police officer have known that he, and his colleagues, could not have removed Green as they did from the backseat of a police vehicle, when Green, who was under the influence of drugs and alcohol and who ultimately had to be sedated and restrained, physically resisted his removal? The majority opinion has not answered this question. Fortunately, however, the Supreme Court has. In Brosseau v. Haugen, 543 U.S. 194, 125 S.Ct. 596, 160 L.Ed.2d 583 (2004), the Supreme Court has furnished us with guiding principles for the determination of when a course of an officer’s conduct qualifies for immunity.
Even if I were to assume that the officers’ actions in the instant case could possibly have reached the level of excessive force—a position I do not take—it is evident here that the officers’ actions fell into that “hazy border between excessive force and acceptable force,” so that it was by no means clearly established that their conduct violated the Fourth Amendment. Saucier v. Katz, 533 U.S. 194, 206, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001). Accordingly, I respectfully dissent from the *164 majority’s opinion, as the officers here are clearly entitled to qualified immunity.
I.
In order to deny an official qualified immunity, a court must engage in two levels of analysis. The first is a finding that a constitutional right was violated. The second is whether the plaintiff’s rights, in this case Green’s rights, were clearly established. I focus here on this second level, for nowhere in the District Court’s opinion or in the majority’s opinion or in any case, statute, regulation, or custom have we been informed that police officers cannot remove a resisting arrestee from a police vehicle in the manner in which these officers removed Green. Although “there does not have to be a precise factual correspondence between the case at issue and a previous case in order for a right to be clearly established,” Kopec v. Tate, 861 F.3d 772, 778 (3d Cir.2004), I believe that the majority has conceived of the right here at issue at too “high [a] level of generality” to be useful in a case that presents this entirely novel fact pattern. Brosseau v. Haugen, 543 U.S. 194, 199, 125 S.Ct. 596, 160 L.Ed.2d 583 (2004) (finding that the test for excessive force as set out in Graham v. Connor, 490 U.S. 386, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989), was too general to be the sole reference point for whether a right was clearly established in a non-obvious case).
A right is clearly established if, “in the specific context of the case,” Saucier, 533 U.S. at 201, 121 S.Ct. 2151 (emphasis added), the “contours of the right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right.” Atkinson v. Taylor, 316 F.3d 257, 261 (3d Cir.2003) (quoting Anderson v. Creighton, 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987)). In other words, “[t]he relevant, dispositive inquiry ... is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted.” Saucier, 533 U.S. at 202, 121 S.Ct. 2151 (emphasis added). As the Supreme Court has explained,
An officer might correctly perceive all of the relevant facts but have a mistaken understanding as to whether a particular amount of force is legal in those circumstances. If the officer’s mistake as to what the law requires is reasonable, however, the officer is entitled to the immunity defense.
Id. at 205, 121 S.Ct. 2151 (emphasis added). See also Tofano v. Reidel, 61 F.Supp.2d 289, 304 (D.N.J.1999) (Barry, District J.) (stating that “if reasonable officers could believe that a certain course of conduct is unlawful but other reasonable officers could believe that the conduct was lawful, qualified immunity attaches.”).
II.
This court has, in the past, used the factors listed in Graham v. Connor, 490 U.S. 386, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989), and Sharrar v. Felsing, 128 F.3d 810 (3d Cir.1997), to delineate the “contours of the right” to be free from excessive force. See, e.g., Estate of Smith v. Marasco, 430 F.3d 140, 149-50 (3d Cir.2005) (using the Graham/Sharrar factors to find that the right at issue was not clearly established). Those factors, which must guide an officer determining the appropriate level of force to employ, include:
the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight ... [whether] the persons subject to the police action are themselves violent or dangerous, the duration of the action, whether the action takes place in *165 the context of effecting an arrest, the possibility that the suspect may be armed, and the number of persons with whom the police officers must contend at one time.
Sharrar, 128 F.3d at 821-22 (internal quotations omitted). I cannot agree that these officers applied these factors in an unreasonable manner. Furthermore, even if, as the majority believes, the officers did use excessive force here, it is not “clearly established” that the Graham/Sharrar factors are appropriately specific to the facts such that they would put the officers on notice that their actions were unlawful.
The majority’s conclusion that the officers unreasonably applied the Graham/Sharrar factors is based on three of Green’s factual allegations. The majority contends that it would be excessive force, and, more importantly for this discussion, that reasonable officers would know that it was excessive force, for the officers to: (1) grab Green by the throat; (2) hit him on the head twice with a flashlight; and (3) kick him after he had been extracted from the car.
Accepting as true Green’s version of the disputed facts, as I must under our standard of review, I still cannot conclude that any reasonable officer would know that this conduct was excessive. Green, seated in the back of the police car, was drunk, threatening to urinate in the back of the vehicle, and was cursing and yelling. It is undisputed that Green was aggressive and combative. See App. 57 (“[Green’s] level of aggression and his demeanor escalated. He was more combative____”). Officer Parry heard a banging on the plexiglass divider between the front and back seats, and discovered that Green, who was “screaming, kicking, [and] yelling,” had gotten his handcuffs in front of his body. Parry was concerned “for [Green’s] safety and mine.” App. 59; Supp.App. 24 (“he could have injured me with his cuffs.”). He believed a physical response was necessary, as Green was agitated and had not been responsive to Parry’s verbal attempts to pacify him. App. 57; Supp.App. 24.
According to Green, Parry grabbed Green by the neck and tried to pull him out of the car. Parry then repeatedly told Green to get out of the car, but Green would not. Officer Fife sprayed Green with mace or pepper spray. As the videotape reveals and as Green admits, the officers then backed away from the car door and asked Green if he was going to get out of the car or continue to resist. App. 184. Despite this opportunity to end the confrontation, Green still refused to exit. Instead, he wedged his feet under the front seat of the car and braced his head and shoulders against the partition dividing the back seat. Officers Parry and Fife then punched and kicked him to try to extricate him from the car, but to no avail. Having tried verbal orders to come out of the car, attempts to pull him out of the car, and pepper spray, Green now alleges that Officer Fife twice hit Green in the head with a flashlight.[10] The officers were finally able to pull Green out of the car. The officers, according to Green, threw him to the ground, kneed him in the back, and kicked him.[11]
*166 Green was then transported to the hospital. The medical staff reported that Green was combative—yelling, swearing, and biting at the staff—requiring that he be placed in four-point restraints and sedated with Ketamine and later, Haldol.
In this context, how can it be that the officers unreasonably applied the Graham/Sharrar factors? Green, who was under the influence of alcohol and drugs and may have been mentally disturbed (as witnessed by his ultimate sedation and four-point restraint), was threatening to urinate in the back of the car and posed a threat to the officers. Officer Parry said he was afraid Green would injure him and Officer Fife was worried Green had a hidden weapon. Green did not initially resist being handcuffed, but he was resisting removal. And, he repeatedly refused to follow the officers’ reasonable orders to get out of the car. As the majority concedes, the use of force here was not inappropriate. See maj. op. p. 161. But how much force is on the acceptable side of that “hazy border between excessive force and acceptable force,” where the person subject to the police action is arrested and handcuffed, yet still in somewhat of a position of advantage over the officers?
The majority says that it would certainly be clear to a reasonable officer that the force Green describes was excessive. I, on the other hand, conclude that a reasonable officer could think he was using only that force which was necessary to protect himself, extract Green from the car, and subdue him. If I may ask the majority: how would they extricate an individual from a car when he is under the influence of alcohol and drugs, aggressive, mentally disturbed, combative, and has resisted all entreaties and urging? Would my colleagues entice him with drugs, money, beguiling songs, alcohol-or would they let him remain in the vehicle as long as he desires, even though he requires medical attention?
III.
A recent Supreme Court case involving far more egregious and excessive force circumstances than we encounter here, informs my conclusion that the officers here have qualified immunity. In Brosseau v. Haugen, 543 U.S. 194, 125 S.Ct. 596, 160 L.Ed.2d 583 (2004), Kenneth Haugen brought a claim for excessive force against Officer Rochelle Brosseau. The facts here are instructive. A former crime partner of Haugen’s reported to Officer Brosseau that Haugen had stolen some tools from his shop. The officer also learned that there was a felony no-bail warrant out for Haugen’s arrest on drug and other offenses. When Officer Brosseau located Haugen, Haugen fled on foot. Officer Brosseau and two other officers searched for him throughout the neighborhood. The officers instructed the people in the near vicinity to stay in their vehicles. After approximately 30 to 45 minutes, Haugen reappeared and jumped into the driver’s seat of his car. He closed and locked the door. Officer Brosseau said she believed Haugen might be trying to retrieve a weapon. Id. at 195-95, 125 S.Ct. 596.
Officer Brosseau arrived at the car, pointed her gun at Haugen, and ordered him to get out of the car. He ignored her, and instead looked for his car keys so he could start the vehicle. After Haugen continued to ignore her commands to exit the car, Officer Brosseau hit the driver’s side window with her handgun several times, shattering it. After unsuccessfully trying to grab the car keys, the officer hit Haugen on the head with the barrel and butt of her gun. Haugen was nevertheless able to start the engine. Officer Brosseau jumped back and to the left, and fired one shot through the rear driver’s side window. *167 The shot hit Haugen in the back. Haugen sustained a collapsed lung, and later pled guilty to the felony of “eluding.” Id. at 196-97, 125 S.Ct. 596.
Officer Brosseau said that she fired her gun because she was afraid for the safety of the officers on foot—who had been last seen two houses away, for the safety of the people in the occupied vehicles, and for the safety of anyone else who might be in Haugen’s path. Id. at 197, 125 S.Ct. 596.
The Supreme Court, while expressing no opinion on constitutional question of whether Officer Brosseau had used excessive force, reversed the Ninth Circuit’s decision which had denied Officer Brosseau’s motion for qualified immunity. The Court found that Brosseau was entitled to qualified immunity because Haugen’s rights had not been dearly established at the time of the confrontation. Id. at 198, 125 S.Ct. 596.
The Court found error in the fact that the Ninth Circuit had relied on “the general tests set out in Graham and [Tennessee v.] Gamer ”[12] to find that Officer Brosseau had “fair warning” that her use of deadly force in this situation was unlawful. Id. at 199, 125 S.Ct. 596. The Court remarked that the “present case is far from the obvious one where Graham and Garner alone offer a basis for decision.” Id. Reviewing the caselaw, the Court concluded that “this area is one in which the result depends very much on the facts of each case.” Id. at 201, 125 S.Ct. 596. Accordingly, Brosseau’s actions fell within that “hazy border between excessive and acceptable force,” entitling her to qualified immunity. Brosseau, 543 U.S. at 201, 125 S.Ct. 596 (quoting Saucier, 533 U.S. at 206, 121 S.Ct. 2151).
Brosseau makes it abundantly clear that the actions of Officer Parry and his colleagues fall, as well, into that “hazy border” which the Supreme Court found qualified Officer Brosseau for immunity. I am aware of no case that establishes Green’s rights in this situation at the “ ‘particularized’” level that the Supreme Court has instructed is necessary. Brosseau, 543 U.S. at 199, 125 S.Ct. 596 (quoting Saucier, 533 U.S. at 202, 121 S.Ct. 2151). This is not a case about the amount of force that can be used to handcuff a person resisting arrest. See e.g., Cruz v. City of Wilmington, 814 F.Supp. 405, 413 (D.Del. 1993) (finding that where arrestee “repeatedly refused to follow the officers’ directions while both inside and outside the vehicle,” alleged conduct of officers in pulling him from car and twisting his arm in order to handcuff him was not excessive force). Nor is it a case about gratuitous violence on a handcuffed and compliant arrestee. See e.g., Sanders v. Workman, No. 97-694, 2001 WL 656072, at *2 (D.Del. Mar. 26, 2001) (finding allegations sufficient to support claim of excessive force where plaintiff, who did not resist arrest, alleged officer handcuffed him then assaulted him by pushing, shoving, and pressing thumb into his head).
Rather, the “particularized” right at issue here is: whether to use force, including kicks and two blows to the head, to extricate from a police vehicle a drunk and high-on-drugs arrestee who has been handcuffed, but remains aggressive, has brought his hands in front of him and therefore poses a threat to the officers, will not comply with orders to exit the car, and is about to urinate in the backseat. The majority opinion provides no advice or hint as to what a reasonable officer can or should do in circumstances like Green’s. Nor does it tell us where we should look to ascertain any standard procedure for extricating such an individual from a police *168 vehicle. Of even greater importance, the majority has not told us where it is “clearly established” that police officers, such as Parry, Fife, and their colleagues, cannot conduct themselves as these officers did, and as the video shows them doing. Just as Officer Brosseau was not on notice that her use of force—which in that case was deadly—was excessive, so too can the officers who sought to remove Green from the police car not be said to have known that the actions they took were “clearly established” as violating Green’s rights.
Because the police officers’ actions constituted acceptable conduct in the removal of Green from the vehicle, and because any violation of Green’s Fourth Amendment rights had not been clearly established— and the majority has not demonstrated otherwise, I respectfully dissent and would grant the officers’ summary judgment motion upholding their qualified immunity.[13]

. Although we must accept as true Green's statement that he was struck in the head with a flashlight, Officer Fife maintains that he used the flashlight to strike Green on his wrists. App. 123. Moreover, even if Green's injuries did come as a result of being hit on the head with a flashlight, the injuries were slight.

. The videotape is clear that three officers were struggling to pull Green out of the car as best they could. Although Green claims that once out of the car, he was kneed in the back and kicked, the videotapes do not show anything subsequent to Green’s removal from the vehicle.

. 471 U.S. 1, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985).

. See also my dissent and concurrence in Brown v. Muhlenberg Twp., which discusses the clearly established prong of qualified immunity, albeit in a different context. Brown v. Muhlenberg Twp., 269 F.3d 205 (3d Cir.2001) (Garth, J., concurring and dissenting).