McKEAGUE, Circuit Judge,
concurring in part and dissenting in part.
I concur that Defendants are not entitled to qualified immunity on the claim of excessive force because I agree that the record as a whole indicates that a genuine issue of material fact exists as to whether deadly force was justified.
I dissent from the majority’s conclusion that a genuine issue of material fact exists regarding whether Defendants acted with deliberate indifference to Scozzari’s urgent medical needs. I cannot conclude, as the majority does, that the slight delay caused by the officers’ failure to secure the scene by the time paramedics arrived violated Scozzari’s clearly established constitutional rights.
The right at issue is Scozzari’s right to receive adequate medical care when injured while being apprehended by the police. Revere v. Mass. Gen. Hosp., 463 U.S. 239, 244, 103 S.Ct. 2979, 77 L.Ed.2d 605 (1983). The question is whether the officers acted with deliberate indifference to Scozzari’s serious medical needs. We look to whether, objectively, the officers unreasonably delayed Scozzari’s access to medical treatment and whether, subjectively, they consciously disregarded the risk Seozzari faced. As the majority has set out the relevant standards, we turn directly to the facts.
The majority points to two instances of delay: the two minutes that paramedics were “forced” to stage offsite and the three minutes paramedics had to wait due to restricted access to Scozzari. However, a closer examination of the record reveals that it is not clear how long paramedics were staged offsite. The police incident report indicates that Chief Miedzianowski instructed paramedics to stage offsite about a block away at 23:29, when he first radioed for medical aid. At some time before 23:33, paramedics arrived at staging site and waited for clearance to enter the scene. (Paramedic testimony establishes that “staging” and “at scene” are two different things: staging is when paramedics wait for clearance to enter, and “at scene” is the time of arrival onto the scene after receiving such clearance.) At 23:33, paramedics had received clearance and were “at scene,” meaning that they pulled up in their vehicle. At 23:35 paramedics were “at patient.” The majority’s reading of the record—that the ambulance reached the scene at 23:33, then were turned away by Chief Miedzianowski and instructed to stage offsite for an additional two minutes—is simply wrong.[1] The two-minute *469 period from when paramedics were “at scene” (23:33) to “at patient” (23:35) is the time it took the paramedics to park their vehicle, get ready to make contact with Scozzari, and make their way to his location, which included traversing a distance estimated by paramedics to be somewhere between 75-200 feet. Thus, the two-minute period relied on by the majority is time that would have elapsed anyway, regardless of officer conduct.
On this more precise reading of the record, the instruction to stage offsite seems considerably less blameworthy. Chief Miedzianowski gave the instruction to stage offsite when he radioed for medical help at 23:29, meaning simply that the officers had failed to secure the scene at that moment, three minutes after the shooting, not seven minutes after as the majority states. In addition, the three-minute delay from when the paramedics were “at patient” (23:35) to when they were able to assess Scozzari (23:38) simply does not rise to the level of deliberate indifference. While the officers had removed weapons from Scozzari’s hands and waistband when they handcuffed him prior to the paramedics’ arrival, the officers had neglected to cheek the rest of Scozzari’s body for weapons, requiring paramedics to stop their assessment while police checked again and removed additional weapons from Scozzari’s pockets. Such conduct— failing to thoroughly cheek Scozzari when initially securing him—is negligence at most, falling short of the “conscious! ] disregard” required to meet, the deliberate indifference standard. Farmer v. Brennan, 511 U.S. 825, 839, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994) (internal alteration omitted). Plaintiff has not put forward any evidence to indicate that the officers subjectively knew that additional weapons were in Scozzari’s pockets and consciously chose not to retrieve them before the paramedics began attending to him.
Of course, there is still the time the paramedics waited at the staging site for clearance to enter the scene, sometime in between 23:29, when Chief Miedzianowski instructed them to stage offsite, and 23:33, when they arrived on the scene. While the exact amount of time the paramedics waited is unclear, it is evident Scozzari’s treatment was delayed. R. 71-13, Winifred Bryans Dep., at 5-6 (stating that paramedic Carl Bryans and she were staged and that the ambulance met them at their staged position); R. 71-14, Carl Bryans Dep., at 6 (“I was staged longer than the ambulance was, but I don’t recall how long that was.”). Viewing the facts in the light most favorable to Plaintiff, there is evidence that one of the officers spent at least part of this time gathering witness testimony, conduct that is part of routine police work but arguably improper in light of Scozzari’s condition.
On this record, I find little basis to conclude there is a triable fact issue on the subjective component of deliberate indifference. There is no evidence that the officers thought through the chain of events that could lead to a delay in paramedics’ access to Scozzari and then consciously disregarded that risk. But even assuming that the officers’ actions raise an issue of fact, the officers are entitled to qualified immunity because the law did not give fair warning to Miedzianowski and McGraw that their conduct—seeking witnesses to confirm that Scozzari was armed while the ambulance was on its way and before the scene was disturbed by paramedics—was clearly unlawful.
*470 The right of pretrial detainees to adequate medical care is a fairly general one. While a delay-of-treatment claim under the Eighth or Fourteenth Amendments may not quite involve the “factbound morass of reasonableness” that courts must wade through in analyzing a Fourth Amendment claim, Scott v. Harris, 550 U.S. 372, 383, 127 S.Ct. 1769, 167 L.Ed.2d 686 (2007), it undeniably involves a generalized framework through which we view the specific facts of each case. The majority finds that this generalized right, standing alone, gave clear and fair warning to the officers in this case that their conduct was unlawful. The only Sixth Circuit case on which the majority relies for substantive guidance is Estate of Owensby v. City of Cincinnati, 414 F.3d 596 (6th Cir.2005).
Owensby does not provide clearly established law for the officers in our case. In Owensby, an arrestee died from asphyxiation after he was handled roughly during an arrest, handcuffed, and placed in the back of a squad car. Though the officers subjectively perceived that the arrestee was in significant physical distress, none of the officers summoned or attempted to provide emergency medical aid but rather greeted each other, straightened their uniforms, and waited for their superiors to arrive. An EMT was eventually summoned by a sergeant who arrived six minutes after the incident. This Court affirmed the denial of qualified immunity. Owensby, 414 F.3d at 604. What is clearly established in Owensby is only that an officer cannot stand around and do nothing where he subjectively perceives a serious medical need and the arrestee has already been secured. The case at hand is different in two significant respects: (1) the scene had not yet been secured, and (2) the officers responded appropriately to Scozzari’s obvious need for medical attention by promptly calling for an ambulance.
The majority and I differ over whether the officers’ subsequent conduct, which caused a slight delay in paramedics’ access to Scozzari, violated clearly established law. The majority attempts to fit this case under Owensby by reading Owensby to impose a specific duty on police officers that extends beyond promptly summoning an ambulance. They say, “Owensby involved not only the failure to summon medical care, but also the failure to provide medical care.” However, it is clear that Owensby did not break new ground on the generalized “right of pretrial detainees to adequate medical care” but was rather decided as one of the “obvious” cases in which that generalized right sufficed to put officers on notice that their conduct was clearly unlawful. See Brosseau v. Haugen, 543 U.S. 194, 199, 125 S.Ct. 596, 160 L.Ed.2d 583 (2004) (noting that in “an obvious case,” general standards can clearly establish a constitutional violation, “even without a body of relevant case law”). Where officers, upon observing the secured arrestee in precarious physical condition (prompting one officer to comment, “This looks f-ed up. Can he breathe? It doesn’t look like it from the way he’s laying.”), stood around and displayed no intention of ever summoning aid, the general right of pretrial detainees to adequate medical care was sufficient to put officers on notice that their conduct was clearly unlawful. Owensby, 414 F.3d at 600, 604.
Not only does Owensby fail to provide the clearly established law here, no other case in this Circuit or the Supreme Court provides guidance on how an officer must proceed after he has already called for emergency medical services beyond the general admonition not to unreasonably delay access to medical treatment in the face of a serious need. The majority’s decision runs afoul of the Supreme Court’s repeated exhortation to the lower courts *471 “not to define clearly established law at a high level of generality.” Ashcroft v. alKidd, — U.S. -, 131 S.Ct. 2074, 2084, 179 L.Ed.2d 1149 (2011). Otherwise, the qualified immunity doctrine turns from a guarantee of immunity to “all but the plainly incompetent or those who knowingly violate the law,” Malley v. Briggs, 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986), into a rule of pleading. See Anderson v. Creighton, 483 U.S. 635, 639, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987) (“Plaintiffs would be able to convert the rule of qualified immunity ... into a rule of virtually unqualified liability simply by alleging violation of extremely abstract rights.”). The Supreme Court has noted, for example, that “[t]he general proposition ... that an unreasonable search or seizure violates the Fourth Amendment is of little help in determining whether the violative nature of particular conduct is clearly established.” al-Kidd, 131 S.Ct. at 2084 (citing Saucier v. Katz, 533 U.S. 194, 201-202, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001)).
Where a Plaintiff relies solely on the strength of a generalized standard to claim that his constitutional right was violated, it is only in the obvious case that an officer has fair warning his conduct is unlawful. Brosseau, 543 U.S. at 199, 125 S.Ct. 596; Murray-Ruhl v. Passinault, 246 Fed.Appx. 338, 347 (6th Cir.2007) (finding that the Fourth Amendment right at issue was clearly established by the general standard in Tennessee v. Garner because the facts presented “an obvious case involving the use of deadly force”). The majority states the unremarkable proposition that the obligation to provide adequate medical care to an injured detainee is not discharged merely by promptly calling for assistance. Indeed, if officers may not delay summoning emergency medical services in the face of an obvious medical need, logic dictates that, once summoned, officers cannot then unreasonably delay or deny paramedics’ access to the detainee. But this is merely a reformulation of the same generalized standard, which, again, would be sufficient to govern only the obvious case. E.g., King v. Reap, 269 Fed.Appx. 857 (11th Cir.2008) (affirming denial of qualified immunity where officers summoned an ambulance but then sent it away without allowing paramedics to examine or assist detainee).
This case is emphatically not the obvious one. Once an officer has summoned emergency medical aid, the only standard governing his conduct is that he may not unreasonably delay access to the patient. While enough to put officers on notice not to engage in brazenly dilatory behavior, this standard alone is insufficient to have made clear to Officers Miedzianowski and McGraw that they could not interview a few witnesses while the ambulance was en route. See al-Kidd, 131 S.Ct. at 2083 (“We do not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate.”).
The majority contends that I fail to view the record in the light most favorable to Scozzari because I describe the officers’ conduct as “interviewing] a few witnesses while the ambulance was en route” when, in fact, the record shows that “the officers did not interview witnesses to gather their impressions of the events but rather called the occupants of nearby cabins to view Scozzari’s body and observe the weapons he purportedly brandished during the standoff.” I do not see how these two descriptions are different, as both describe officers talking to witnesses. The latter merely goes into the officers’ purported subjective intentions for doing so. The officers’ purported motivations, however, do not make unclear law clear. Using the majority’s language and assuming “that *472 the officers did not interview witnesses to gather their impressions of the events but rather called the occupants of nearby cabins to view Seozzari’s body and observe the weapons he purportedly brandished during the standoff,” there is still no violation of a clearly established constitutional right.
An officer’s duty to secure a crime scene necessitates preserving the exact condition of such scene before paramedics and other personnel disturb it. Thus, in any criminal situation where someone is injured, an officer’s dual duties to secure the scene and ensure access to adequate medical care are in tension, and no court has mandated a clear procedure that officers must follow. Rather, they are guided by the general directive not to unreasonably delay the patient’s access to treatment. This general directive would be sufficient to alert a reasonable officer that he cannot, for example, stall a paramedic’s access to a seriously injured patient while the officer dusts every fingerprint or waits for a forensic specialist to arrive or, as in Owens-by, stand around and do nothing. But it does not put a reasonable officer on notice that they cannot interview a few witnesses—for whatever motivation—while the ambulance is en route, especially where, on any reading of the record, the maximum resulting delay was about three minutes.
The majority opinion sweeps too far. What, then, is an officer to do after summoning an ambulance? Are officers now prohibited from engaging in any investigatory duties that might potentially delay paramedics, even by a few seconds? Is there a time limit on how quickly officers must secure a crime scene? I refrain from further engaging in a parade of horribles and merely conclude that I would reverse the district court’s determination on the basis that the right at issue here was not clearly established. I respectfully dissent.

. While we draw all reasonable inferences in favor of the non-movant, the documents and *469 testimony establishing the timeline of events are not disputed. The timeline is established by the Clare Police Department Incident Report, Mobile Medical Response Patient Care Report, and paramedics’ testimony.