COLLOTON, Circuit Judge,
dissenting.
Notably absent from the majority opinion is any mention of the Supreme Court’s several recent decisions reversing denials of qualified immunity by the courts of appeals. The Court explained that these opinions were necessary “both because qualified immunity is important to society as a whole, and because as an immunity from suit, qualified immunity is effectively lost if a case is erroneously permitted to go to trial.” White v. Pauly, _ U.S. _, 137 S.Ct. 548, 551, 196 L.Ed.2d 463 (2017) (per curiam) (internal quotations and citations omitted). The Court reiterated in these decisions several principles that govern our analysis here:
• “Clearly established law” should not be defined at a “high level of generality,” but must be “particularized” to the facts of the case. Id. at 552, 137 S.Ct. 548 (quoting Ashcroft v. al-Kidd, 563 U.S. 731, 742, 131 S.Ct. 2074, 179 L.Ed.2d 1149 (2011) and Anderson v. Creighton, 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987)).
• Especially in the Fourth Amendment context, where it is sometimes difficult for a police officer to determine how the relevant legal doctrine will apply to the factual situation that the officer confronts, it is important to undertake qualified immunity analysis “in light of the specific context of the case, not as a broad general proposition.” Mullenix v. Luna, _ U.S. _, 136 S.Ct. 305, 308, 193 L.Ed.2d 255 (2015) (per curiam) (quoting Brosseau v. Haugen, 543 U.S. 194, 198, 125 S.Ct. 596, 160 L.Ed.2d 583 (2004) (per curiam)).
• To deny qualified immunity, “existing precedent must have placed the statutory or constitutional question beyond debate.” Mullenix, 136 S.Ct. at 308 (quoting al-Kidd, 563 U.S. at 741, 131 S.Ct. 2074).
• Qualified immunity protects “all but the plainly incompetent or those who knowingly violate the law.” Mullenix, 136 S.Ct. at 308 (quoting Malley v. Briggs, 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986)).
Applying these standards to the specific situation before us, I believe that the police officers are entitled to qualified immunity.
When Brian Hoyland first injected himself into the scene involved here, police officers were in the process of arresting a man and a woman in the middle of the night. The arrestees, suspected of illegal drag racing on city streets, had fled from officers after police attempted to make a traffic stop. The suspect vehicle ultimately came to rest at an unknown residence.
One officer testified that he feared a possible ambush. This was not a frivolous concern. We live in an era when a police officer in Clinton, Missouri, is shot and killed during a routine traffic stop; officers in central Iowa are murdered while sitting in their patrol cars on city streets.[6] Here, *659 police had handcuffed the male suspect but not yet secured him in a police vehicle; the female suspect was not yet restrained. The officers did not know whether the suspect vehicle contained weapons or whether the second suspect was armed. They had no information about Hoyland or his relationship to the arrestees. It was an active arrest scene and an unsettled situation. In that context, it should “[go] without saying that the police may take all reasonable steps to maintain safety and control..., [And] the police may order bystanders to disperse for reasons related to public safety and order and other legitimate law-enforcement needs.” Am. Civil Liberties Union of Ill. v. Alvarez, 679 F.3d 583, 607 (7th Cir. 2012).
The material facts of the incident are recorded on three videos and are therefore undisputed. See Scott v. Harris, 550 U.S. 372, 380-81, 127 S.Ct. 1769, 167 L.Ed.2d 686 (2007). After Hoyland emerged from the house, he refused seven times to comply with police commands. When he first appeared, officers gave several commands that he should get in the house, stay in the house, and get back inside. Hoyland responded by saying, “You are in my yard. You are in my yard.” An officer repeated that Hoyland should get back inside. Hoy-land then presumed incorrectly that he was witnessing a “DWI stop,” and questioned that the officers were “doing thisT An officer reiterated for a third time that Hoyland should get back inside. Hoyland responded by threatening litigation and giving direction to the officers: “She is handicapped; I’m going to sue you. Get over here and do your job the right way.” In a fourth command, an officer directed Hoyland to put his hands in the air; Hoy-land responded (without having accompanied the suspects in the suspect vehicle) that “she doesn’t have a weapon.”
In a fifth exchange, an officer directed Hoyland three more times to put his hands up and ultimately told Hoyland that he was under arrest. Hoyland responded by resisting police authority: “I am not under arrest. I am telling you that my wife is handicapped.” An officer giving the sixth command told Hoyland to raise his hands; Hoyland repeated that his wife was handicapped and then asserted twice that he had no weapons. In the seventh part of the dialogue, an officer informed Hoyland that he was under arrest, and that he should walk toward the officer. Hoyland replied that he had children in the house. An officer then told Hoyland that he would be “tased,” and Hoyland finally complied with the commands.
Police detained Hoyland on his property for fifty minutes and then released him. While in a patrol car, Hoyland told one officer that he was a former military police officer, and that he “would have done the same thing” that the officers did. The officer informed Hoyland that the arrest scene was “probably one of the most dangerous situations for us,” to which Hoyland replied that “I made it worse for you.” Hoyland later sued the officers under 42 U.S.O. § 1983, alleging an arrest without probable cause, in violation of the Fourth and Fourteenth Amendments, and an arrest in retaliation for free speech, in violation of the First and Fourteenth Amendments.
The officers are entitled to qualified immunity on both claims if they had “arguable probable cause” to make an arrest. The Fourth Amendment requires probable cause to arrest, but if police make an objectively reasonable mistake about the existence of probable cause, then they *660 have “arguable probable cause” and are immune from suit. Amrine v. Brooks, 522 F.3d 823, 832 (8th Cir. 2008). A First Amendment retaliation. claim fails if the police had arguable probable cause to arrest. Peterson v. Kopp, 754 F.3d 594, 602 (8th Cir. 2014).
The officers contend that there was at least arguable probable cause to arrest Hoyland for obstructing legal process, in violation of Minnesota Statutes § 609.50, subd. 1(2). That statute makes it unlawful for anyone intentionally to obstruct, resist, or interfere with a police officer while the officer is engaged in the performance of his duties.
There was arguable probable cause to arrest Hoyland under § 609.50. The most straightforward cause for arrest was Hoy-land’s resistance after police informed him that he was under arrest. “Minnesota law does not recognize [a] defendant’s asserted right to resist an unlawful arrest or search.” State v. Wick, 331 N.W.2d 769, 771 (Minn. 1983). The majority focuses on whether the initial decision to arrest Hoy-land was justified by his interference with the ability of the officers to restrain the two suspects and control the scene of those arrests. But even if the initial determination was not supported, Hoyland’s refusal to submit to an arrest — declaring “I am not under arrest,” and refusing to comply with commands — provided arguable probable cause that he committed a violation. Along those lines, the Minnesota Court of Appeals recently held that when a police officer attempted to handcuff a citizen “for his safety” while trying to “sort out [a] situation,” and the citizen resisted the handcuffing,, the officer reasonably believed that he could effect a lawful arrest for obstruction of legal process. Scheffler v. McDonough, No. A16-0949, 2017 WL 1549979, at *4 (Minn. Ct. App. May 1, 2017). The statute does not require proof of a physical act directed at an officer, see State v. Shimota, 875 N.W.2d 363, 373 (Minn. Ct. App. 2016); State v. Gearin, No. A09-0467, 2009 WL 3078581, at *6 n.2 (Minn. Ct. App. Sept. 29, 2009), and there is no clearly established Minnesota law that passive resistance to an arrest is not resistance.
Viewing the situation more broadly, Hoyland’s repeated argumentative refusals to comply with police commands at an active arrest scene also gave police at least arguable probable cause to believe that he violated § 609.50. Although the Minnesota Supreme Court wrote in response to a vagueness challenge that the statute is directed at “physically obstructing or interfering” with an officer, State v. Krawsky, 426 N.W.2d 875, 877 (Minn. 1988), the few decisions applying the statute show that it encompasses violations that do not involve physical contact between an offender and a police officer. The Krawsky court itself said that the statute may be used to punish “any ... words that by themselves have the effect of physically obstructing or interfering with a police officer in the performance of his duties.” Id. Krawsky gave one example — running beside an officer who is pursuing a felon and shouting arid cursing at the officer — but that illustration is not exclusive. Loud and repetitive interruptions of a desk officer, along with four refusals to leave the public area of'a police department, constituted a violation of § 609.50 in State v. Occhino, 572 N.W.2d 316, 320-21 (Minn. Ct. App. 1997). Similarly, a bam owner’s “loud, repetitive, and intentional interruptions” of officers attempting to issue- citations for underage drinking were sufficient to support a conviction under the statute. State v. Hanson, No. C3-00-1986, 2001 WL 1117681, at *3-4 (Minn. Ct. App. Sept. 25, 2001).
We must address qualified immunity “in light of the specific context of the case,” *661 Mullenix, 136 S.Ct. at 308, yet there is no Minnesota court decision applying the statute to alleged obstruction by a third party at an active arrest scene. What constitutes obstruction of an officer may well be different at an active arrest scene than in the reception area at police headquarters. Hoyland refused seven times to comply with commands, of police officers. It was reasonable to believe that his conduct substantially hindered the officers who were .attempting to control the scene, by creating a new security concern and. by preventing the officers from focusing their attention on the two suspects who were apprehended at Hoyland’s residence after fleeing. Hoyland’s persistence in refusing to comply supported an objectively reasonable belief in probable cause that fie intentionally resisted or interfered. It was not beyond debate that the statute encompassed the interruptions and refusals directed at the desk officer in Occhino, and the loud and repetitive interruptions of the officers issuing citations in Hanson, but did not proscribe Hoyland’s interruptions .and distraction of police officers at an active arrest scene.
The majority highlights that a Minnesota district judge later granted Hoyland’s motion to dismiss the criminal charge against him for lack of probable, cause. The state court litigation, however, actually lends credence to ,the position of the officers that there was arguable probable cause. Hoyland’s motion to dismiss was resisted by the State, represented by an assistant city attorney. The court presided over a “contested omnibus hearing” at which the prosecutor presented evidence and received permission to file a written response to Hoyland’s memorandum. In other words, even with 20/20 hindsight not available to the police officers, an independent prosecutor — ethically bound to refrain from prosecuting a charge that he knows is not supported by probable 'cause, Minn. R. Profl Conduct 3.8(a) — pursued the charge against Hoyland for obstructing legal process. On the relevant question here — whether an objectively reasonable police officer could. have believed that there was probable cause to arrest — the prosecutor’s judgment that the evidence justified prosecution is as significant as the decision of the state judge to dismiss the charge. We have said that a prosecutor’s pre-arrest advice that a seizure is permissible “can show the reasonableness of the action taken,” Frye v. Kan. City Mo. Police Dep’t, 375 F.3d 785, 792 (8th Cir. 2004) (internal quotation omitted), and a prosecutor’s post-arrest judgment to press a charge similarly can shed light on whether the officers were objectively reasonable.
The majority concludes that it is “now for a jury to decide” whether the officers “acted constitutionally.” Ante, at 657-58. Respectfully, this conclusion confuses the roles of judge and jury. Juries find facts; as the majority acknowledges, “we have no historical facts in dispute.” Id. at 651-52. The district court thought there were factual disputes about whether Hoyland “intended to interfere” with the performance of duties and whether Hoyland’s conduct “substantially frustrated” the officers. But the majority does not embrace these questions, and rightfully so. The, facts of the incident are recorded on videotape and are undisputed. What Hoyland intended or whether the officers were substantially frustrated is not at issue.
The question is whether a reasonable police officer could have believed there was probable cause that Hoyland acted with the requisite intent and that his conduct substantially frustrated or hindered the officers in the performance of' their duties. This is a legal determination for the court. By confirming that there are no disputed historical facts and concluding _ on those facts that the police officers violated Hoy- *662 land’s clearly established rights under the Fourth Amendment, the court effectively grants judgment as a matter of law for Hoyland on that claim.
Police officers have a tough job. Decisions like this one make it tougher. By denying qualified immunity on undisputed facts, the majority necessarily concludes that the officers here were plainly incompetent or knowingly violated the law. In my view, the limited clearly established law concerning the Minnesota statute does not justify that conclusion when the analysis is properly particularized to the facts of this case. I would reverse the order of the district court and direct entry of judgment in favor of the officers based on qualified immunity.

. See Robert A. Cronkleton, et al, Suspect Charged with Murder in Death of Clinton, Mo., Police Officer; Manhunt on, Kansas City Star (Aug. 7, 2017, 6:41 AM), http://www. kansascity.com/news/local/crime/article 165802862.html; Kathy A. Bolten, Police 'Heartbroken' After Ambush Leaves 2 Des Moines-Area Officers Dead, Des Moines Regis *659 ter (Nov, 3. 2016, 1:23 PM), http://www. desmoinesregister.com/story/news/2016/ll/02/ 2-pQlice-officers-killedambush-attacks/ 93155012/.