O’BRIEN, Circuit Judge,
concurring in part and dissenting in part.
The majority concludes Derek Aragon is entitled to qualified immunity because the law it announces today was not clearly established at the time of these events and the municipality is entitled to summary judgment. I agree, but can go no further. The law now established for this Circuit, taken without regard to the facts of this case, is reasonable enough, and. benign— “the general risks created by a motorist’s fleeing from the police are [not], without more, enough to justify a shooting that is nearly certain to cause that suspect’s death.” (Majority Op. at 1190.) But even the newly minted rule cannot reasonably lead one to conclude a constitutional violation occurred here.
The majority repeatedly emphasizes that Aragon shot Toby Cordova in the back of the head. It makes it sound like an execution. Certainly that is what Cordova’s survivors would have us believe. But, as I will demonstrate, the record tells a quite different story. Aragon needed to stop a dangerous man astride eight tons of machinery[3] and exhibiting evil intent. That man, Cordova, had repeatedly demonstrated a callous willingness to endanger others rather than submit to police authority.
Aragon fired five shots — all shots were fired in one second or less — the first bullet entered through the windshield and three others entered the side windows of Cordova’s truck as it hurtled past Aragon; there was no accounting for the fifth. If the first shot was justified, as it clearly was, all shots were justified — that the fatal shot was the last or came from an oblique angle is of no moment. This was not gentlemen’s boxing, governed by the Marquis of Queensberry rules. And Aragon was not trying to frighten Cordova into submission, an unlikely prospect in the penetrating light of recent events. Aragon was trying to put an end to an obviously dangerous situation.[4] Such being the case, an officer cannot be expected to shoot, pause to evaluate the effect, and then calmly decide whether it is necessary or prudent to shoot again. That is a lot to do in one second under extreme conditions. The only question we need address is whether, in the instant it was made, Aragon’s- decision to use deadly force was reasonable. We need not parse the details occurring within one second after the first trigger pull. The shots came of urgent necessity and great fear. Aragon was justified in opposing the deadly force bearing down upon him with equal force. His decision to use deadly force was reasonable under these circumstances. No constitutional violation occurred here. I dissent from the majority’s contrary holding.
I. Factual Background
As the majority concedes, to decide this case we must “slosh our way through the factbound morass of ‘reasonableness.’ ” Scott v. Harris, 550 U.S. 372, 383, 127 S.Ct. 1769, 167 L.Ed.2d 686 (2007). But *1197 the majority has studiously ignored the very facts which justified Aragon’s use of force.
In our totality of the circumstances analysis we must consider all uncontested facts and construe genuinely contested material facts in the light most favorable to Cordova. Cordova is also entitled to all inferences reasonably drawn from those facts. It is a tedious process, but at the end of the day (if we do not confuse arguments, allegations and assumptions with facts) there are few contested material facts and those are easily construed in Cordova’s favor, although doing so does not salvage plaintiffs case. Sweeping generalizations do not inform this debate; the devil is in the details, which I now relate.
At 12:58 A.M., Officer James Zamora, a Commerce City police officer, noticed a dual-wheeled truck towing a trailer with a skid-steer loader[5] near Chambers Road and 104th Avenue in Commerce City, Colorado. Knowing thefts of construction machinery had recently occurred in the area and considering the oddity of such equipment being hauled at 1:00 A.M., Zamora reported the trailer’s license plate number to dispatch. Dispatch reported the trailer’s registered address was not in the immediate area so Zamora decided to stop the truck. He activated his vehicle’s overhead lights but Cordova, the driver of the truck, refused to stop; instead Cordova continued west on 104th Avenue, running a red light. Zamora’s supervising officer ordered Zamora to terminate his pursuit but ordered other officers to respond to the area in hopes of sealing it off.
Zamora stopped, deactivated his overhead lights and watched Cordova proceed down 104th Avenue and through its intersection with Colorado Highway 2. But a train blocked the 104th Avenue escape so Cordova turned into a parking lot and turned off his lights. Zamora saw this and alerted others over police radio at 1:04 A.M. At this time, six separate officers were in the area and became involved in the pursuit: Zamora, Aragon, Nance, Rubino, Douglas and Walkinshaw. Zamora and Rubino drove to the parking lot and attempted to contain Cordova by blocking his exit with their cruisers. They were unsuccessful because Cordova drove at them, nearly hitting both vehicles. Officer Rubino reported Cordova “drove directly at her and [she] felt that [he] was attempting to ‘ram’ her patrol car.” (R. Appellants’ App. Vol. II at 268.) Based on Cordova’s actions, the officers resumed the pursuit.
After leaving the parking lot, Cordova ran another red light and proceeded north on Colorado Highway 2.[6] Zamora sped ahead of Cordova and attempted to lay “stop sticks”[7] on the road but Cordova went off the road to avoid them. Aragon and Nance (who were traveling in the same vehicle) stationed themselves at the junction of Highway 2 and Interstate 76 (1-76) in order to deploy stop sticks. Their efforts came to naught because Cordova entered eastbound 1-76 to avoid their stop sticks. Zamora, who had followed Cordova onto 1-76, raced ahead and again prepared to deploy stop sticks just past the interchange with Interstate 470. Aragon and Nance also followed Cordova onto eastbound 1-76. Aragon observed “moderate traffic” or more specifically “three or four cars” travelling westbound on 1-76. *1198 (R. Appellants’ App. Vol. I at 196, 201.) He “was in fear for the safety of the public----” (Id. at 201.)
Aragon’s experience with pursuits included situations where a fleeing suspect crossed into oncoming traffic to escalate the danger and force police to terminate the pursuit. Based on Cordova’s reckless driving and attempts to avoid capture, Aragon feared Cordova would cross the median, endangering other motorists. Therefore, Aragon and Nance, with their vehicle’s emergency lights activated, crossed the median to warn oncoming traffic. Shortly thereafter, Cordova did just as Aragon feared — he crossed the median just before the location where Zamora had deployed stop sticks. Cordova did not turn west on 1-76 (the direction of normal traffic flow). Instead he fell in behind Aragon’s cruiser. At this point both Cordova and Aragon were moving in the wrong direction on the westbound lanes of 1-76. Although both lanes were open at that time, Cordova came up behind Aragon’s cruiser (within two feet). Aragon had to accelerate to avoid being hit. Because there was “plenty of room to get around [our car]” Aragon felt Cordova’s near-miss of his vehicle was another attempted ramming. (Id. at 87.) Aragon sped up to gain enough distance to warn other motorists and allow a safe deployment of stop sticks across the westbound lanes. Aragon believed Cordova was acting in an “extremely dangerous” manner and using his truck as a “deadly weapon.” (Id.) Aragon stopped approximately % of a mile later, blocking the westbound lanes with his ear.[8] Nance exited the vehicle and went into the median. Aragon attempted to lay stop sticks but realized Cordova’s vehicle was approaching quickly and was already too close for him to safely do so.
As Cordova neared the police cruiser (and Aragon and Nance) he first drove toward Nance’s position in the median. Nance pulled his weapon and aimed it at Cordova. Cordova then “made an abrupt turn and swerved” toward Aragon’s position heading toward the entrance ramp from 136th Avenue (where he would be going the wrong way on the ramp). (Id. at 82.) Zamora said Cordova’s vehicle “swerved and thrashed about.” (Id. at 72.)[9] Aragon “feared for [his] life” at that moment and believed he “was about to be run over.” (Id. at 88.) In response, Aragon fired his weapon five times. For purposes of summary judgment only, the defendants conceded one bullet entered through the windshield and four through the driver side windows of the truck. They also conceded, again for purposes of summary judgment only, the fatal bullet was fired from the side of the truck, “after some or all of the truck had passed Officer Aragon.” [10] (Id. at 45.) Aragon stated he fired because he “was in immediate danger ... about to be run over.” (Id. at 88.) While firing, Aragon felt “in imminent danger of death — of being run down by this large truck.” (Id.) Cordova’s truck continued, only stopping when it hit a tree. The speedometer was frozen at 50 miles per *1199 hour (mph). At 1:14:12 A.M. the police supervisor ordered the pursuit terminated. Five seconds later, at 1:14:17 A.M., Aragon reported shots fired.
The entire chase lasted approximately sixteen minutes and covered about eight miles of county, state, and interstate highways.[11] The last portion of the chase occurred on a section of 1-76 approximately four miles long.[12] Assuming Cordova’s truck was traveling 40 mph,[13] the chase on 1-76 lasted approximately six minutes.
None of the above facts are disputed (except the minor fact noted in footnote 11), but there are other disputed facts, which weigh in Cordova’s favor, albeit only slightly. I accept them as true. One relates to the distance Aragon was from Cordova’s truck at the time Aragon fired his weapon. Aragon’s statements in an interview have the truck at a distance of “10, 15 feet” or “probably five, seven feet if that.” (Id. at 204-05.) Cordova’s expert calculated Aragon to be at least 13 feet from the path of Cordova’s vehicle. I accept the version related by Cordova’s expert.
There is also a very minor discrepancy regarding the time between the first and last shot. It could be as little as .75 seconds or as much as 1.03 seconds; hardly a matter of constitutional significance.[14]
II. Constitutional Analysis
Excessive force claims are analyzed under the Fourth Amendment’s objective reasonableness standard, Graham v. Connor, 490 U.S. 386, 388, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989), informed by the totality of the circumstances. Tennessee v. Garner, 471 U.S. 1, 8-9, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985). “Because the test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application, ... its proper application requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.” Graham, 490 U.S. at 396, 109 S.Ct. 1865 (citation and quotations omitted).
“The ‘reasonableness’ of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.” Graham, 490 U.S. at 396, 109 S.Ct. 1865 (“Not every push or shove, even *1200 if it may later seem unnecessary in the peace of a judge’s chambers violates the Fourth Amendment.”) (citation and quotations omitted). “The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments — in circumstances that are tense, uncertain, and rapidly evolving — about the amount of force that is necessary in a particular situation.” Id. at 396-97, 109 S.Ct. 1865. The majority concludes Aragon’s conduct in shooting Cordova was unreasonable because Aragon was not in immediate danger at the moment of the fatal shot and the risk Cordova posed to the general public did not justify the use of deadly force. That is easy to say from the ivory tower years after the fact. In any event, the facts do not support either conclusion.
A. Threat to Aragon
The district court concluded the danger to the public justified Aragon’s acts, therefore no constitutional violation occurred. It went on to say disputed facts clouded the issue as to whether Aragon was in immediate danger at the time of the shooting. Therefore, construing the facts in the light most favorable to Cordova,[15] it assumed Aragon was not in immediate danger at the time of the shooting. With no analysis the majority accepts that assumption. We may affirm on any basis supported by the record, even though not relied on by the district court. Felix v. Lucent Techs., Inc., 387 F.3d 1146, 1163 n. 17 (10th Cir.2004). We should do so here by critically evaluating the danger to Aragon. That danger, as well as danger to the public, justifies the shooting.
We review de novo a district court’s summary judgment decision. See Smith v. Maschner, 899 F.2d 940, 942 (10th Cir.1990). In doing so, we apply the same standard as that used by the district court and examine the record to determine whether there are genuine disputes as to material facts and whether the prevailing party was entitled to judgment as a matter of law. Id. at 942-43. No facts are “found” in a summary judgment and the district court’s analysis and conclusions are entitled to no deference. While we view the historical facts in the light most favorable to the non-moving party, in this case Cordova, we do not equate argument and allegations with fact. Lawmaster v. Ward, 125 F.3d 1341, 1349 (10th Cir.1997). The plaintiff, who has the burden of proof in qualified immunity cases, must show a genuine dispute regarding a material fact before we construe that fact in his favor. Scott, 550 U.S. at 380, 127 S.Ct. 1769. “Where the record taken as a whole could not lead a rational trier of fact to find for the [party claiming injury], there is no genuine issue for trial.” Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (quotations omitted). “[Mjetaphysical doubt as to the material facts” is not enough. Id. at 586, 106 S.Ct. 1348.
In examining the undisputed facts of this case, it is clear Aragon felt his life was in immediate danger at the time of the shooting, as would any reasonable officer in the same circumstances. Aragon’s words make the case. Neither the words he used nor the facts related are controverted in this record. As he was debriefed by his supervising officer at the scene, Aragon was “visibly shaken and his voice cracked.” (R. Appellants’ App. Vol. II at 270.) Aragon told his supervisor, “I felt it when [Cordova] passed by me,” which the supervisor interpreted as meaning Aragon felt the wind disruption created by the truck as it passed. (Id.) In the police *1201 department investigation interview just hours after the shooting, Aragon stated:
I saw him come straight at me.... I feared, feared for my life at that point. Uh drop the stop sticks where they were and uh deployed my hand gun at that point.... [W]hen he’s ... coming straight at me.... I think I am going to be a hood ornament to this big truck.... I just didn’t feel like I had any other option at that point.
(R. Appellants’ App. Vol. I at 203, 205, 207.) Finally, in a sworn affidavit, he recounted the final seconds of the incident:
I realized that the truck was too close [to deploy the stop sticks]. It was bearing down on me, and I feared for my life.... I thought he was going to run me down. I thought I was about to become a hood ornament on this truck.... [T]he truck turned and was coming straight at me.... Knowing that I was in immediate danger, that I was about to be run over, I fired my weapon.... While I was firing my firearm at the vehicle, I felt that I was in imminent danger of death — of being run down by this large truck. I stopped firing when I perceived that the danger had abated. I fired all of the rounds at the truck in one or two seconds.
(Id. at 88.)
The majority concludes Aragon was not in imminent harm or death because Cordova’s track had already passed him when he fired the fatal shot. While the defendants conceded for purposes of summary judgment that all or part of the truck had passed Aragon, two telling facts remain undisputed — one second, or less, passed between the first and final shot and the first shot entered the windshield, not the driver side window. The shots cannot be parsed in slow motion but must be considered as an integrated whole. No officer could recognize within one second and in the midst of a violent confrontation that the danger prompting the use of force had totally abated. Cordova’s massive truck and loaded trailer passed so close Aragon “felt it when [Cordova] passed by.” (Id. at 220.) As I said in the introduction, if the first shot was justified they all were justified. The only issue requiring resolution is whether, in the instant it was made, Aragon’s decision to use deadly force was reasonable. No fact, inference, or combination thereof available in this record can reasonably lead one to conclude Aragon’s split-second decision was unreasonable. That is especially true if, as required, we judge the “particular use of force [ ] from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.” Graham, 490 U.S. at 396, 109 S.Ct. 1865. The majority is simply wrong in saying “whatever danger [Aragon] might have perceived had passed by the time he fired the fatal shot.” (Majority Op. at 1187.)
The majority also departs from the required totality of the circumstances analysis, see Garner, 471 U.S. at 8-9, 105 S.Ct. 1694; Lawmaster, 125 F.3d at 1349, by disregarding dramatic events leading up to the shooting and in failing to balance the equities. See Scott, 550 U.S. at 383-84, 127 S.Ct. 1769 (stating it is appropriate to take into account not only the individuals whose lives are at danger but their relative culpability in creating that danger). Scott held there is a difference between ramming a car and shooting at the fleeing suspect but recognized the appropriate level of force necessary to end a pursuit will always be tied to the level of danger the suspect has created. Id. at 383-84 & n. 10, 127 S.Ct. 1769 (“Culpability is relevant, however, to the reasonableness of the seizure — to whether preventing possible harm to the innocent justifies exposing to possible harm the person threatening them.”).
*1202 Without doubt shooting at Cordova placed him in grave danger. On the other hand, he used his eight-ton rig to lead a number of officers on a 16-minute chase on public roadways, disregarded traffic laws, attempted to ram Rubino’s car, drove on and off the road to avoid capture, endangered the lives of Aragon and Nance by attempting to ram their police cruiser, drove at Nance until a weapon was aimed at him, and then drove at Aragon. Collectively, if not individually, those events would lead any reasonable officer in Aragon’s position to believe he was in imminent danger, the public was at risk and that risk was immediate, if not imminent. Cordova, alone, was responsible for the level of danger that led to his death. In spite of numerous opportunities to simply stop his truck and submit to the authority of the police he continued to use eight tons of mass in an attempt to bull his way out of trouble.
Cordova alleges and argues that any threat to Aragon was a creation of his own making. With minimal analysis the majority accepts his argument as fact. It is not a fact and it is not a reasonable conclusion flowing from actual facts.
“The reasonableness of Defendants’ actions depends both on whether the officers were in danger at the precise moment that they used force and on whether Defendants’ own reckless or deliberate conduct during the seizure unreasonably created the need to use such force.” Sevier v. City of Lawrence, Kan., 60 F.3d 695, 699 (10th Cir.1995). The record is clear Aragon did not voluntarily place himself in the path of Cordova’s truck. He neither forced Cordova to drive at him nor jumped into Cordova’s path. Rather, Cordova purposely and voluntarily “swerved,” or “made an abrupt turn,” in Aragon’s direction. (R. Appellants’ App. Vol. I at 72 (Zamora stating: “[T]he truck ... swerved and thrashed about....”), 82 (Nance stating: “The truck then made an abrupt turn and swerved.... ”).) It was Cordova, not Aragon, who created the need for deadly force.
While Aragon may have mistakenly believed he could safely deploy the stop sticks and perhaps did not allow himself enough time to safely do so, the qualified immunity standard “gives ample room for mistaken judgments,” protecting “all but the plainly incompetent or those who knowingly violate the law.” Malley v. Briggs, 475 U.S. 335, 341, 343, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986); see also Pearson v. Callahan, — U.S. -, 129 S.Ct. 808, 815, 172 L.Ed.2d 565 (2009) (the protection of qualified immunity extends to reasonable mistakes of law, fact, or a combination thereof). Aragon’s mistaken judgment (if that it be) and his resulting vulnerability does not make him responsible for the threat Cordova deliberately posed to him, other officers, and the general public.
An officer may not purposely place himself in harm’s way to justify a seizure, but an officer need not avoid a confrontation at all costs. See Scott, 550 U.S. at 385-86, 127 S.Ct. 1769 (police are not obliged to call off a pursuit simply because the pursuit may endanger others). Aragon was not required to dive out of the way to avoid a confrontation caused by Cordova. In Sevier, three officers approached an allegedly suicidal individual who had threatened no harm to anyone but himself. 60 F.3d at 698. In response to the officers’ provocation, the individual lunged at an officer and was shot. Id. The district court determined the officers were not entitled to summary judgment on qualified immunity grounds because genuine issues of material facts remained in dispute. Id. at 699. While we concluded we lacked jurisdiction over the officers’ appeal, we observed the record revealed some evi *1203 dence upon which a jury could conclude that the officers acted recklessly by confronting the victim in the manner they did knowing he was armed and distraught and without gathering more information on the situation. Id. at 700, 701 n. 10. Conversely, in Jirón v. City of Lakewood, we affirmed a grant of qualified immunity to a police officer who confronted a felony suspect attempting escape from a closed room with a deadly weapon in hand. 392 F.3d 410, 418 (10th Cir.2004). We held the officer did not exhibit reckless behavior by entering the room because avoiding the confrontation “risked the escape of an armed and agitated suspect into the public and risked a potentially more violent confrontation.” Id. Jirón distinguished Sevier where a suicidal person posed no threat to others while in a confined area. Id. at 419. Like the facts of Jirón, Aragon reasonably stood his ground against a fleeing suspect using deadly force against him and who had previously shown a propensity to risk harm to others.
B. Threat to the General Public
Would the public have been better served had Aragon simply let Cordova again escape? [16] The Supreme Court has said “no” in similar circumstances. “We think the police need not have taken that chance [injury to the suspect or others] and hoped for the best.” Scott, 550 U.S. at 385, 127 S.Ct. 1769. The majority is, of course, correct in weighing the risks of harm to Cordova against the risk of harm to the public (in addition to the risk of imminent harm to Aragon). Part of the inquiry must be the immediacy and probability of harm. See id. at 384, 127 S.Ct. 1769 (“[I]t is clear ... respondent posed an actual and imminent threat .... ”); see also Graham, 490 U.S. at 396, 109 S.Ct. 1865 (“the test of reasonableness ... requires careful attention to the facts ... including ... whether the suspect poses an immediate threat to the safety of the officers or others” and “whether he is actively resisting arrest or attempting to evade arrest”). But there is even more to the test, including but not limited to the urgency of the situation, the risk to the police, the alternatives available, and the relative culpability of the actors. Scott, 550 U.S. at 384, 127 S.Ct. 1769; Graham, 490 U.S. at 396, 109 S.Ct. 1865. The risk to Cordova was, of course, extreme. Shooting at someone, as Scott points out, is a great deal different from ramming their vehicle. Scott, 550 U.S. at 383, 127 S.Ct. 1769. But Scott is not the most analogous application of deadly force the Supreme Court has recently considered. Another shooting begs consideration.
In Brosseau v. Haugen, a police officer, engaged in the pursuit of a fleeing suspect, watched him get into a parked vehicle. 543 U.S. 194, 196, 125 S.Ct. 596, 160 L.Ed.2d 583 (2004). She repeatedly ordered him to exit the vehicle and briefly engaged in a struggle with him (where she broke the vehicle’s window and hit him in the head with the butt of her handgun). Id. When he started the vehicle and began pulling away, the officer shot him in the back. Id. at 196-97, 125 S.Ct. 596. She was never in the path of the vehicle, had no knowledge of any individuals who were or had been endangered by the vehicle, and was aware of no imminent threat to others should he be permitted to flee. Nevertheless, she shot him. Id. at 197, 125 S.Ct. 596. Officer Brosseau said her use of force was grounded in a fear “for the other officers on foot who she believed were in the immediate area, and for the occupied vehicles in [the suspect’s] path and for any other citizens who might be in the area.” Id. (quotations omitted). The Ninth Circuit reversed a grant of summary judgment, finding a constitutional vi *1204 olation was clearly established by Garner and Graham. See Haugen v. Brosseau, 339 F.3d 857, 874 (9th Cir.2003). The Supreme Court reversed on narrow grounds. 543 U.S. at 201, 125 S.Ct. 596. The case is more important for what it did not say than for what it did say. The Court did not say shooting a fleeing suspect in the back without being able to identify a single person who could have reasonably been in danger was a constitutional violation. Instead, it said Gamer (involving a youth running away and clearly posing no danger to anyone) and Graham did not clearly establish the law. Id. at 199, 125 S.Ct. 596. The Court held Brosseau’s fears for the safety of people who may, or may not, have been in the area shifted her actions into the “hazy border between excessive and acceptable force,” and therefore her actions were not a clearly established constitutional violation. Id. at 201, 125 S.Ct. 596 (quotations omitted).
Officer Brosseau’s fears for the safety of others were neither as well articulated nor immediate as Aragon’s. He experienced firsthand being in the path of Cordova’s truck, knew of other attempted rammings, personally observed Cordova’s dangerous driving on and off the road, and saw other vehicles on I76.[17] The majority should have followed the lead of the Supreme Court and stopped with a holding of no violation of clearly established law. We are now unnecessarily committed to a contrary, and in my view, erroneous path.
The majority minimizes the risk Cordova posed to other drivers, saying there were “[no] other motorists ... in the vicinity” and Cordova’s actions were “general dangers” which posed a “risk of future harm [that] was not enough to justify the near certainty of Mr. Cordova’s death.” (Majority Op. at 1190.) Case law does not require the threat to the general public be immediately recognizable. Gamer said use of deadly force is warranted to prevent escape if the police officer “has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others.” Garner, 471 U.S. at 11, 105 S.Ct. 1694. The Court did not require immediacy of a threat to non-officers. Scott affirmed this notion when it rejected the injured motorist’s suggestion that an immediate threat of harm was one of the preconditions set forth in Gamer. See Scott, 550 U.S. at 381-82, 127 S.Ct. 1769 (“Gamer did not establish a magical on/off switch that triggers rigid preconditions whenever an officer’s actions constitute ‘deadly force.’ [It] was simply an application of the Fourth Amendment’s ‘reasonableness’ test to the use of a particular type of force in a particular situation.”) (citation omitted). In Scott, the police rammed the individual to avoid speculative future injury to other *1205 individuals on the road. The majority described the pursuit as a “Hollywood-style car chase of the most frightening sort” which placed police and bystanders at great risk of serious injury. Id. at 380, 127 S.Ct. 1769. However, the dissent saw it much differently, saying “no pedestrians, parked cars, sidewalks, or residences were visible at any time,” the suspect never lost control of his vehicle, and even “slowed and waited for the cars traveling in the other direction to pass before overtaking the car in front of him while using his turn signal to do so.” Id. at 392-93, 127 S.Ct. 1769 (Stevens, J. dissenting). The majority determined the risk of letting a suspect flee into the night because his actions were reckless would create more reckless driving by suspects who would know escape was within reach. Id. at 385-86, 127 S.Ct. 1769; see also Brosseau, 543 U.S. at 198, 125 S.Ct. 596 (expressly declining to consider use of deadly force as a constitutional violation).
Like the future danger recognized in Scott, Cordova’s significant risk of future reckless behavior and dangerousness justified immediate action. Regardless of the justification provided by the imminent threat to Officer Aragon, the threat Cordova posed to the general public also provided an independent justification for the use of deadly force.
Past behavior is the best predictor of future behavior. Cordova’s past behavior, evident on this record, is clear evidence of a wanton disregard for the safety of others. Zamora stated Cordova “was willing to place an officer and the public in danger. The truck had become a deadly weapon.” (R. Appellees’ Supp.App. at 2.) Rubino “felt [Cordova] had endangered [her] life and was using his vehicle as a deadly weapon.” (Id. at 3.) To Nance, “it was clear ... [Cordova] was extremely dangerous and was using his truck as a deadly weapon.... I was in fear for my life.” (R. Appellants’ App. Vol. I at 81-82.) And Aragon said Cordova “was bearing down on me, and I feared for my life.... I thought I was about to become a hood ornament on this truck.... I felt that I was in imminent danger of death.” (Id. at 88.) When Aragon crossed the median he was worried about the “safety of the public that was traveling” after seeing “three or four cars” on 1-76 and witnessing firsthand Cordova’s dangerous behavior. (Id. at 201.) These subjective impressions are fully supported in the record.
Cordova had once broken from confinement (in the parking lot) by aggressive means and was threatening to do so again. The threat Cordova posed to the public was far from hypothetical. Cordova represented a substantial and significant risk to anyone he may have met as he proceeded the wrong way up the 1-76 entrance ramp. Apparently no cars were present on the ramp, but Aragon, being otherwise occupied and with his back to the ramp, cannot reasonably be charged with such knowledge. Traffic was light in the early-morning hours, but Aragon saw cars on I-76 during the chase; it was not just speculation for him to conclude a car could be coming down the entrance ramp. But it is quite speculative to assume (as the majority suggests) such a car encountering Cordova’s truck with laden trailer would be able to avoid a collision. And other, but more remote, dangers were reasonably within the orbit of risk. If Cordova had again broke confinement and escaped without causing a head on collision on the ramp, his past behavior strongly suggests what he would do if he were to later encounter another police car, even one ignorant of his escapades.
Cordova posed “a threat of serious physical harm, either to the officer or others,” which fully justified Aragon “to prevent escape by using deadly force.” Weigel v. Broad, 544 F.3d 1143, 1152 (10th Cir.2008), *1206 cert. denied, — U.S.-, 129 S.Ct. 2387, 173 L.Ed.2d 1295 (2009) (quotations omitted). Certainly he posed more than a “general danger[ ].” (Majority Op. at 1190.) The threat Cordova posed to the public was considerably more evident, more immediate, and more serious than that presented to Officer Brosseau, who shot a fleeing suspect from behind before his vehicle even moved. Her act, motivated by fear for other police officers, occupied vehicles, and even individuals she did not know existed was not determined to be a constitutional violation Brosseau, 543 U.S. at 197, 125 S.Ct. 596. Aragon’s less egregious acts deserve no harsher treatment.
There was no constitutional violation here. I would affirm the judgment of the district court so holding. The district court also entered summary judgment in favor of the Commerce City Police Department because Aragon committed no constitutional violation. I would affirm that decision as well, for the same reason. Graves v. Thomas, 450 F.3d 1215, 1218 (10th Cir.2006) (citing City of Los Angeles v. Heller, 475 U.S. 796, 799, 106 S.Ct. 1571, 89 L.Ed.2d 806 (1986)).
I join the majority in holding 1) Aragon’s acts violated no clearly established law and 2) the Commerce City Police Department is entitled to summary judgment. From all else, I dissent.
*1207 [[Image here]]
*1208 [[Image here]]

. Often called a "dually,” trucks such as Cordova’s normally weigh over two tons. Cordova’s truck, a 1990 Chevrolet K3500 Extended Cab, weighs over 5,000 pounds.
http://autos.msn.com/res earch/vip/specJSxteri- or.aspx?year=1990 & make= Chevrolet & model=C/K3500 & trimid=-l. It was pulling a trailer hauling a skid-steer loader, a piece of construction equipment. The model involved here, a Takeuchi TL150 loader, has an operating weight of 10,902 pounds. See http://www. takeuchi-us.com/TLl 50.html.

. “It ain't over till it’s over.” Yogi Berra.

. The substantial size and weight of Cordova’s rig obviously increases stopping distance and decreases maneuverability.

. See maps, Attachments A & B.

. " 'Stop sticks' are a device which can be placed across the roadway and used to flatten a vehicle's tires slowly to safely terminate a pursuit.” Scott, 550 U.S. at 397 n. 9, 127 S.Ct. 1769 (Stevens, J., dissenting).

. There is no dispute as to whether Aragon’s vehicle blocked the westbound lanes; the only dispute is whether the car was facing the entrance ramp or the median. This dispute is immaterial because Aragon was clearly not behind the police vehicle at the time he shot at Cordova.

. Zamora was on Eastbound 1-76, parallel to Cordova's truck and trailer.

. Four of the shots definitively hit Cordova’s truck: at least one bullet entered through the windshield, two entered the driver side window, and a fourth entered through the driver side window of the truck's extended cab. It was not determined whether the fifth shot hit Cordova’s truck.

. Attachment A is a map showing the path of the entire chase with markers depicting the points at which significant events occurred.

. Attachment B is a closer look at the portion of 1-76 on which the chase occurred, again with markers depicting the points at which significant events occurred.

. The majority’s use of 30 mph comes from a description of speeds in the initial stages of the pursuit on 104th Avenue. Cordova was travelling faster in the last seconds before his final encounter with Aragon. Nance said in his police interview Cordova was going "[f]orty” or "[mjaybe 50” miles per hour during the chase on 1-76. (R. Appellants' App. Vol. I at 237.) Aragon's estimate was about the same in his sworn affidavit. But in another interview, he stated: "[Cordova was going] probably 50, maybe 60” miles per hour on I-76. (Id. at 202; see also id. at 88 ("As the truck came toward me, traveling at around 50 or 60 miles an hour....”).) For these purposes the lower estimated speed of 40 miles per hour is used because it most favors Cordova.

. Cordova’s expert's calculations assume his truck travelled 60.5 feet between the first and fatal shot (at 55 mph). This would mean all four shots were taken in .75 seconds. Assuming Cordova was travelling 40 mph, or 58.66 feet-per-second (fps), 1.03 seconds passed between the first and last shot.

. The district court went overboard. It construed more than facts and inferences favorably to Cordova. We need not repeat that mistake.

. He earlier escaped containment in the parking lot.

. In footnote 6 the majority faults me for mentioning the other vehicles on westbound 1-76 (supra at 1197) claiming they were not referenced in the briefs and we are not obligated to scour the record in search of facts. We may not be obligated to scour the record in order to fairly decide a case, but we are not prohibited from doing so. Aragon referred to other vehicles several times, not just once. I was alerted to his statements from a record cite in Cordova's opening brief where he discusses Aragon's reason for crossing the median of 1-76. (Appellant's Br. at 8.) The district court said a jury could find Aragon’s testimony untrustworthy, but we are not bound by that unsupported and improper conclusion. The district court heard no evidence and could make no findings (certainly not credibility findings); it looked at the same record we do. The presence of other vehicles on I-76 is nowhere contradicted in the record and there is no objective reason to discredit Aragon's statements about them. Contrary to the majority's assertions, we must accept uncontroverted facts even if they are inconvenient — ■ there were other vehicles on westbound 1-76. The majority does not simply construe the factual record in Cordova’s favor, it assumes facts favorable to his position (and its conclusions).